IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LITL LLC,<br><br>        Plaintiff,<br><br>v.<br><br>HP INC.<br><br>        Defendant. | C.A. No. 23-120-RGA |
| MICROSOFT CORPORATION,<br><br>        Intervenor-Plaintiff,<br><br>v.<br><br>LITL LLC,<br><br>        Intervenor-Defendant. | |
| LITL LLC,<br><br>        Intervenor-Defendant /<br>        Counterclaim Plaintiff in<br>        Intervention,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>        Intervenor-Plaintiff /<br>        Counterclaim Defendant in<br>        Intervention. | |

i

LITL LLC,

               Plaintiff,

v.

DELL TECHNOLOGIES INC. and DELL INC.,

               Defendants.

C.A. No. 23-121-RGA

---

MICROSOFT CORPORATION,

               Intervenor-Plaintiff,

v.

LITL LLC,

               Intervenor-Defendant.

---

LITL LLC,

               Intervenor-Defendant /
               Counterclaim Plaintiff in
               Intervention,

v.

MICROSOFT CORPORATION,

               Intervenor-Plaintiff / Counterclaim
               Defendant in Intervention.

LITL LLC,

              Plaintiff,

v.

ASUSTEK COMPUTER INC. and ASUS GLOBAL PTE. LTD.,

              Defendants.

C.A. No.  23-122-RGA

---

MICROSOFT CORPORATION,

              Intervenor-Plaintiff,

v.

LITL LLC,

              Intervenor-Defendant.

---

LITL LLC,

              Intervenor-Defendant / Counterclaim Plaintiff in Intervention,

v.

MICROSOFT CORPORATION,

              Intervenor-Plaintiff / Counterclaim Defendant in Intervention.

**JOINT CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

**Page**

I.    Introduction .................................................................................................. 1

    A.    Plaintiff's Opening Position ................................................................ 1

    B.    Defendants' Answering Position .......................................................... 3

II.   Representative claims .................................................................................... 3

    A.    '688 Claim 11 ...................................................................................... 3

    B.    '688 Claim 17 ...................................................................................... 4

    C.    '844 Claim 10 ...................................................................................... 4

    D.    '229 Claim 1 ........................................................................................ 5

    E.    '154 Claim 11 ...................................................................................... 6

    F.    '315 Claim 1 ........................................................................................ 7

    G.    '715 Claim 1 ........................................................................................ 8

    H.    '818 Claim 1 ........................................................................................ 8

    I.    '888 Claim 1 ........................................................................................ 9

III.  Agreed-upon constructions ........................................................................... 9

IV.   Disputed Constructions ............................................................................... 11

    A.    Term 1: "Display Mode" ................................................................... 11

        1.    Plaintiff's Opening Position .................................................... 12

        2.    Defendants' Answering Position ............................................. 15

        3.    Plaintiff's Reply Position ........................................................ 17

        4.    Defendants' Sur-Reply Position .............................................. 18

    B.    Term 3: "Plurality of Display Modes" ............................................... 18

        1.    Plaintiff's Opening Position .................................................... 19

            a.    Defendants' Proposed Construction is (a) Unnecessary; and (b) Erroneous as Inconsistent with the Prosecution History ............... 19

            b.    The Phrase "Plurality of Display Modes" in the Preambles Is Not Limiting ................................................................................ 22

        2.    Defendants' Answering Position ............................................. 23

            a.    Dell's Answering Position ................................................. 26

        3.    Plaintiff's Reply Position ........................................................ 28

            a.    Defendants' Proposed Construction Fails. .................................... 28

            b.    Dell's Proposed Construction Fails. ............................................. 30

        4.    Defendants' Sur-Reply Position .............................................. 31

    C.    Term 2: "Means for Detecting" ......................................................... 32

i

1.      Plaintiff's Opening Position......................................................... 33

2.      Defendants' Answering Position.................................................. 35

3.      Plaintiff's Reply Position............................................................ 37

4.      Defendants' Sur-Reply Position ................................................. 39

D.      Term 5: "An Accelerometer…"........................................................... 40

1.      Plaintiff's Opening Position......................................................... 41

2.      Defendants' Answering Position.................................................. 43

3.      Plaintiff's Reply Position............................................................ 45

4.      Defendants' Sur-Reply Position ................................................. 46

E.      Term 4: "Display Orientation Module" ............................................... 47

1.      Plaintiff's Opening Position......................................................... 50

2.      Defendants' Answering Position.................................................. 50

3.      Plaintiff's Reply Position............................................................ 52

        a.      Defendants Fail to Overcome the Presumption. .......................... 52

        b.      Even If "Display Orientation Module" Were Subject to §112 ¶6, It Is Not Indefinite. ........................................................................ 53

4.      Defendants' Sur-Reply Position ................................................. 54

F.      Term 6: "Disable the Keyboard…" ...................................................... 55

1.      Plaintiff's Opening Position......................................................... 56

2.      Defendants' Answering Position.................................................. 61

3.      Plaintiff's Reply Position............................................................ 65

        a.      LiTL's Statement Was Not Made to Overcome a Prior Art Rejection. ..................................................................................... 65

        b.      Defendants Fail to Show that LiTL's Interpretation of the Prosecution History Is Unreasonable............................................ 66

4.      Defendants' Sur-Reply Position ................................................. 68

G.      Term 7: '888 and '315 Preambles ........................................................ 69

1.      Plaintiff's Opening Position......................................................... 70

2.      Defendants' Answering Position.................................................. 71

3.      Plaintiff's Reply Position............................................................ 73

        a.      '315 Preambles ............................................................................ 73

        b.      '888 Preambles ............................................................................ 74

4.      Defendants' Sur-Reply Position ................................................. 74

H.      Term 8: "Streamlined Computing Device"........................................... 75

1.      Plaintiff's Opening Position......................................................... 75

2.      Defendants' Answering Position ....................................................... 75

3.      Plaintiff's Reply Position .................................................................. 78

4.      Defendants' Sur-Reply Position ....................................................... 80

I.      Term 9: "Map Based Graphical User Interface"................................... 81

1.      Plaintiff's Opening Position............................................................. 82

2.      Defendants' Answering Position ....................................................... 82

3.      Plaintiff's Reply Position .................................................................. 85

4.      Defendants' Sur-Reply Position ....................................................... 87

## TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*ABS Glob. v. Cytonome/St,*
    84 F.4th 1034 (Fed. Cir. 2023) ...............................................................................41, 45, 46

*Acumed LLC v. Stryker Corp.,*
    483 F.3d 800 (Fed. Cir. 2007)................................................................................................87

*AIA Eng'g v. Magotteaux Int'l,*
    657 F.3d 1264 (Fed. Cir. 2011)..............................................................................................22

*Alarm.com, Inc. v. SecureNet Techs. LLC,*
    345 F. Supp. 3d 544 (D. Del. 2018) (Andrews, J.) .........................................................86, 87

*Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.,*
    841 F.3d 1334 (Fed. Cir. 2016).............................................................................................54

*Ansell Healthcare Prods. v. Reckitt Benckiser,*
    No. 15-915-RGA, 2018 WL 620968 (D. Del. Jan. 30, 2018)...........................................22, 42

*Apple, Inc. v. Samsung Elecs. Co.,*
    No. 11-cv-01846-LHK, 2012 WL 2993856 (N.D. Cal. July 20, 2012)..................................16

*Arctic Cat Inc. v. GEP Power Prods., Inc.,*
    919 F.3d 1320 (Fed. Cir. 2019).............................................................................................70

*Aristocrat v. Int'l Game Tech.,*
    521 F.3d 1328 (Fed. Cir. 2008).................................................................................39, 40, 51

*Asyst Techs., Inc. v. Empak, Inc.,*
    268 F. 3d 1364 (Fed. Cir. 2001).....................................................................35, 36, 37, 39

*Aylus Networks, Inc. v. Apple Inc.,*
    856 F. 3d 1353 (Fed. Cir. 2017).....................................................................................23, 31

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.,*
    512 F.3d 1338 (Fed. Cir. 2008)................................................................................... *passim*

*Baxalta Inc. v. Bayer HealthCare LLC,*
    No. 17-1316-RGA, 2019 WL 3290987 (D. Del. July 22, 2019) ......................................61, 64

*Berkheimer v. HP Inc.,*
    881 F.3d 1360 (Fed. Cir. 2018)..............................................................................................77

*Biogen Idec, Inc. v. GlaxoSmithKline LLC,*
    713 F.3d 1090 (Fed. Cir. 2013)..............................................................................................64

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
  783 F.3d 1374 (Fed. Cir. 2015)..................................................................76, 79

*Bioverativ v. CSL Behring*,
  No. 17-914-RGA, 2019 WL 1276030 (D. Del. Mar. 20, 2019) ............................22

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002).................................................................23, 71, 72

*ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*,
  35 F.4th 1345 (Fed. Cir. 2022) ...........................................................................79

*Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*,
  958 F.3d 1348 (Fed. Cir. 2020)......................................................................70, 71

*Cont'l Cirs. LLC v. Intel Corp.*,
  915 F.3d 788 (Fed. Cir. 2019)........................................................................59, 64

*Convolve v. Compaq Comput.*,
  812 F.3d 1313 (Fed. Cir. 2016)...........................................................................41

*Crown Operations Int'l v. Solutia*,
  289 F.3d 1367 (Fed. Cir. 2002)...........................................................................46

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001)...........................................................................61

*Dayco Prods., Inc. v. Total Containment, Inc.*,
  258 F.3d 1317 (Fed. Cir. 2001)...........................................................................20

*Deere & Co. v. Bush Hog, LLC*,
  703 F.3d 1349 (Fed. Cir. 2012)...........................................................................74

*Default Proof Credit Card v. Home Depot USA*,
  412 F. 3d 1291 (Fed. Cir. 2005)...........................................................................39

*Dippin' Dots, Inc. v. Mosey*,
  476 F.3d 1337 (Fed. Cir. 2007)...........................................................................65

*Eli Lilly Co. v. Teva Pharms. Int'l GmbH*,
  8 F.4th 1331 (Fed. Cir. 2021) ............................................................................72

*Harari v. Lee*,
  656 F.3d 1331 (Fed. Cir. 2011)......................................................................44, 46

*Helsinn Healthcare S.A. v. Dr. Reddy's Lab'ys, Ltd.*,
  No. CIV.A. 11-3962 MLC, 2015 WL 1817109 (D.N.J. Apr. 22, 2015) ................64

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014)..........................................................76, 77, 80, 81

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999)..................................................................29, 31

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F. 3d 898 (Fed. Cir. 2004)........................................................................47

*M2M Sols. LLC v. Sierra Wireless Am., Inc.*,
No. 12-30-RGA, 2015 WL 5826816 (D. Del. Oct. 2, 2015) ...........................52, 53

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
194 F.3d 1250 (Fed. Cir. 1999)..................................................................33, 34

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
30 F.4th 1339 (Fed. Cir. 2022) ...................................................................79, 80

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)..........................................................25, 31, 56

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
778 F.3d 1021 (Fed. Cir. 2015)..................................................................72, 73

*Power Integrations v. Fairchild Semiconductor Int'l*,
904 F.3d 965 (Fed. Cir. 2018)........................................................................42

*Prolitec Inc. v. ScentAir Techs., LLC*,
No. 20-984-WCB, 2023 WL 8697973 (D. Del. Dec. 13, 2023) ...........................74

*Rain Computing v. Samsung Elecs. Am.*,
989 F.3d 1002 (Fed. Cir. 2012)..................................................................50, 51

*Salazar v. AT&T Mobility LLC*,
64 F.4th 1311 (Fed. Cir. 2023) .......................................................................44

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
948 F.3d 1342 (Fed. Cir. 2020)........................................................................81

*SanDisk Corp. v. Memorex Prods., Inc.*,
415 F.3d 1278 (Fed. Cir. 2005)........................................................................61

*Sentient Sensors v. Cypress Semiconductor*,
No. 19-1868-MN, 2021 WL 289410 (D. Del. Jan. 28, 2021)................................23

*SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*,
983 F.3d 1367 (Fed. Cir. 2021)........................................................................72

*Sonix Tech. v. Publications Int'l,*
844 F.3d 1370 (Fed. Cir. 2017)..........................................................80, 81, 85

*Springs Windows Fashions LP v. Novo Indus., L.P.,*
323 F.3d 989 (Fed. Cir. 2003)......................................................................26, 65

*Sprint Commc'ns Co. v. Comcast IP Holdings, I, LLC,*
No. 12-1013-RGA, 2014 WL 309432 (D. Del. Jan. 28, 2014)..............................76

*StrikeForce Techs. Inc. v. PhoneFactor Inc.,*
No. 13-490-RGA-MPT, 2015 WL 5708577 (D. Del. Sept. 29, 2015) .............53, 55

*Summit 6, LLC v. Samsung Elecs. Co.,*
802 F.3d 1283 (Fed. Cir. 2015)......................................................................70

*SunRace Roots Enter. Co. v. SRAM Corp.,*
336 F.3d 1298 (Fed. Cir. 2003)..........................................................59, 67, 69

*Tech. Props. Ltd. v. Huawei Techs. Co.,*
849 F.3d 1349 (Fed. Cir. 2017)......................................................................24, 31

*TQ Delta, LLC v. 2Wire, Inc.,*
No. 13-1836-RGA, 2018 WL 626472 (D. Del Jan. 30, 2018)..............................51

*In re Varma,*
816 F.3d 1352 (Fed. Cir. 2016).............................................................. *passim*

*Vectura Ltd. v. GlaxoSmithKline LLC,*
No. 16-638-RGA, 2018 WL 4700222 (D. Del. Oct. 1, 2018) ...................... *passim*

*Versa v. Ag-Bag Int'l,*
392 F.3d 1325 (Fed. Cir. 2004)......................................................................34

*Vetstem Biopharma, Inc. v. California Stem Cell Treatment Ctr., Inc.,*
No. 19-004728-AB-FFM, 2020 WL 5648353 (C.D. Cal. Sept. 9, 2020)..........59, 64, 67

*Viatech Techs. v. Microsoft,*
No. 14-1226-RGA, 2016 WL 3398025 (D. Del. June 14, 2016)..........................34

*Williamson v. Citrix Online, LLC,*
792 F.3d 1339 (Fed. Cir. 2015).............................................................. *passim*

*WSOU Invs. LLC v. Google LLC,*
No. 2022-1064, 2023 WL 6531525 (Fed. Cir. 2023) ......................................54

**Statutes**

35 U.S.C. § 112.................................................................................. *passim*

## I.    INTRODUCTION

### A.    Plaintiff's Opening Position

LiTL's inventions described and claimed in the Asserted Patents earned praise after their invention in 2008 and have become ubiquitous industry standards today. LiTL recruited leading laptop technology and user experience design experts to develop the "Webbook," known as a "2-in-1" device because it combined features of conventional tablets and laptops into a single, streamlined device. LiTL sold the Webbook for several years.

Where traditional laptops had fixed interfaces, LiTL's inventors improved the user experience by enabling these 2-in-1 or "convertible" laptops to be configured into different "display modes" (Ex. 2 ('688 Patent), 2:6-9)[1] "including a closed mode, a laptop mode, an easel mode, a flat mode and a frame mode" (*id.*, 2:19-22).

---

[1] Citations to Exs. 1-40 are the exhibits attached to the parties' Joint Claim Construction Chart. No. 23-120-RGA, D.I. 85; No. 23-121-RGA, D.I. 81; No. 23-122-RGA, D.I. 92. Amended Ex. 22 and Exs. 41-63 refer to the exhibits attached to the parties' Joint Appendix, filed simultaneously herewith.



Ex. 20, ¶62.

Five of the nine disputed terms (Nos. 1-5) concern display modes. Defendants' proposed

constructions fail to clarify what these display modes are or how they are detected. Defendants

2

seek to import limitations not present in the claims and indeed contradicted by the intrinsic evidence. They also propose constructions contrary to those adopted by the examiner, and seek to add a negative limitation absent from the claim. And they argue that preambles that merely describe a proposed use are limiting, contrary to established law.

### B.    Defendants' Answering Position

The LiTL asserted patents have been the subject of multiple post-grant challenges, both by a prior defendant and by the Defendants here.  In defending these challenges, LiTL made detailed arguments about the scope of the claims and why the prior art purportedly does not disclose them.  For example, LiTL argued that the claims require identifying the specific "display mode" of the device, such as "laptop," "easel," or "frame" mode, and changing the organization of the displayed content accordingly.  LiTL argued that the claims reciting detection of a "plurality of display modes," require detection of every supported display mode. Nonetheless, LiTL now attempts to reverse course and say those are not limitations on the claims at all.  And for good reason:  none of the accused products practice these features that LiTL used to distinguish the prior art.  Having successfully avoided several Patent Office challenges based on detailed arguments characterizing the features of its patents over the prior art, LiTL should now be held to those same characterizations here.

## II.    REPRESENTATIVE CLAIMS

### A.    '688 Claim 11

A portable computer comprising:
a base;
a display component rotatably coupled to the base;
means for rotating the display component in a single direction relative to the base to
    configure the portable computer between a laptop mode and an easel mode;
a *display orientation module* configured to automatically orient content displayed on the
    display component responsive to at least a transition between the laptop mode and the
    easel mode, wherein the display orientation module is further configured to orient the

content displayed between a first display orientation and a second display orientation, the first and second display orientations being 180 degrees relative to each other; and

***means for detecting*** an orientation of the base relative to the display component, wherein the means for detecting is further configured to identify the transition between the laptop mode and the easel mode based on a stored threshold orientation.

**B.    '688 Claim 17**

A method of automatically orienting content in a ***plurality of display modes*** displayed on a portable computer comprising a body, the body having a single display component including a display screen and a base including an integrated keyboard, the method comprising:

rotating the single display component of the portable computer about a longitudinal axis running along an interface between the single display component and the base of the portable computer;

detecting a degree of rotation of the single display component relative to the base;

providing a signal representative of the degree of rotation of the single display component;

comparing the degree of rotation with respect to a threshold degree of rotation;

determining a ***display mode*** based, at least in part, on the act of comparing the degree of rotation with respect to the threshold degree of rotation;

generating a visual display of the content for the display screen;

orienting the visual display shown on the display screen of the single display component towards an operator for operation of the portable computer in each of the ***plurality of display modes***, wherein the ***plurality of display modes*** includes a laptop mode with the integrated keyboard and display oriented towards the operation and an easel mode with the display oriented towards the operator and the keyboard oriented away from the operator; and

automatically configuring a content orientation, relative to the longitudinal axis, of the visual display on the display screen of the portable computer responsive to the signal and the determined ***display mode***, wherein the act of automatically configuring includes acts of:

displaying the visual display in a first content orientation of the content for the degree of rotation that is less than the threshold degree of rotation and the portable computer is determined to be configured in the laptop mode, and

displaying the visual display in a second content orientation of the content for the degree of rotation that is greater than the threshold degree of rotation and the portable computer is determined to be configured in the easel mode, the second content orientation being at 180 degrees relative to the first orientation.

**C.    '844 Claim 10**

A portable computer configurable between a ***plurality of display modes*** including a laptop mode and an easel mode wherein transitions between the ***plurality of display***

*modes* permit an operator to interact with a single display screen in each of the *plurality of display modes*, the portable computer comprising:

a base including a keyboard;

a main display component rotatably coupled to the base and including the single display screen which displays content;

a hinge assembly disposed at least partially within the base and the main display component that defines an axis of rotation about which both the base and the main display component are rotatable to transition the portable computer between at least the laptop mode and the easel mode,

wherein the transition between the laptop mode and the easel mode allows the operator to operate the portable computer while viewing the single display screen in each of the *plurality of display modes*,

wherein the laptop mode is configured to display to a user on the main display component a first content mode having a first content display orientation with the main display component oriented towards the user and the keyboard oriented to receive input from the user;

the easel mode is configured to display to the user on the main display component a second content mode having a second content display orientation with the main display component oriented towards the user and the keyboard oriented away from the user,

wherein the first and second content display orientations are 180 degrees relative to each other, and

wherein the portable computer is operable in the easel mode to enable the user to interact with displayed content without interacting with the keyboard; and

a navigation control accessible in each of the *plurality of display modes* and configured to permit a user to manipulate at least one of operating parameters of the portable computer and the content displayed on the single display screen

wherein the plurality of modes includes a frame mode in which the main display component is oriented towards the operator, the base contacts a substantially horizontal surface, and the keyboard faces the substantially horizontal surface.

## D.    '229 Claim 1

A portable computer configurable between a *plurality of display modes* including at least a laptop mode, a frame mode, and an easel mode, the portable computer comprising:

a display component;

a base;

*an accelerometer configured to generate orientation information indicative of a current display mode among the plurality of display modes of the portable computer*;

a display manager configured to display computer content on the display component and vary the computer content displayed responsive to the orientation information indicating a transition between at least the laptop and easel modes, wherein the

display manager is further configured to enlarge the computer content displayed on the display component responsive to a transition from the laptop mode to the easel mode;

an interface between the display component and the base defining a longitudinal axis running along the display component and the base about which the display component and the base are rotatable;

wherein the interface is constructed and arranged such that rotating either the display component or the base about the longitudinal axis up to approximately 180 degrees from a closed mode configures the portable computer into the laptop mode, wherein in the laptop mode the display component is oriented towards an operator and a keyboard disposed within the base is oriented to receive input from the operator;

wherein the interface is constructed and arranged such that rotating either the display component or the base about the longitudinal axis beyond approximately 270 degrees from the closed mode transitions the portable computer for viewing in the frame mode or the easel mode, wherein during operation in the frame mode the display component is positioned toward the operator, the base contacts a substantially horizontal surface, and the keyboard is directed towards the substantially horizontal surface, and wherein during operation in the easel mode the display component is oriented facing the operator with the keyboard oriented away from the operator; and

wherein the portable computer is configured to detect a transition to at least the easel mode and the frame mode based on the orientation information, automatically determine a display orientation of content, and *disable the keyboard when the portable computer is in the frame mode*.

## E.    '154 Claim 11

A portable computer configurable between a *plurality of display modes* comprising a first mode, a second mode, and a third mode, the portable computer comprising:

a display component comprising a surface;

a display screen disposed in the surface of the display component;

a camera disposed in the surface of the display component;

a base comprising a first surface and a second surface;

a keyboard disposed in the first surface of the base;

a touchpad disposed in the first surface of the base;

a power button disposed in the second surface of the base;

a central processing unit disposed in the base;

hinge assembly that rotatably couples the base to the display component, the hinge assembly being configured to permit the display component to rotate relative to the base up to at least 270 degrees from a closed position where the surface of the display component faces the first surface of the base;

an orientation sensor configured to generate orientation information indicative of an orientation of at least part of the portable computer; and

a display manager configured to detect a current *display mode* from among the *plurality*

6

*of display modes* based at least in part on the orientation information, display content in a first orientation when the current *display mode* is the first mode or the third mode, display content in a second orientation that is rotated 180 degrees relative to the first orientation when the current *display mode* is the second mode, and enlarge at least some computer content displayed on the display screen when the current *display mode* transitions from the first mode to the second mode.

## F.    '315 Claim 1

A customized user interface for a computer system with a plurality selectable I/O profiles configured to present computer operations to a user in a format configured to a selected I/O profile on a display component of the computer system, the user interface comprising:

at least one processor;

a *map based graphical user interface*, executing on the at least one processor operatively connected to a memory of the computer system, the *map based graphical user interface*, when executing, is configured to display information on the display component of the computer system, wherein the map based user interface is further configured to:

display a plurality of views of a plurality of visual representations of computer content on the computer system, wherein the computer content includes at least one of selectable digital content, executable computer applications, configurable computer settings, selectable computer operations and passive digital content;

display the plurality of visual representations of computer content rendered on the display component, wherein the plurality of visual representations of computer content include an association to a first home view of the plurality of views, the first home view including a display of the computer content, and wherein the each of the plurality of visual representations is responsive to focus and execution, wherein execution includes selecting the visual representation, and wherein the first home view is a first organizational view of at least one application and computer content displayed responsive to activation of the system; and

an execution component, executing on the at least one processor, configured to:

identify at least a first and a second computer system configuration based on sensor input indicating a position of the display component relative to a base component;

select, responsive to the sensor input, a first home view from the plurality of views for the first computer system configuration, wherein the first home view is configured to organize a first set of the plurality of visual representations;

filter the first set of visual representations to present content that is optimized for viewing in the second system configuration at least in part by identifying content to filter, removing the identified content from the first set of visual representations, and generating a second set of visual representations based on the filtered first set of visual representations, wherein the second set of visual representations includes at least one different member than the first set of visual representations; and

transition, automatically in response to the sensor input, the display component between at the first home view of the plurality of views and a second default content view of the plurality of views, wherein the second default content view is configured to organize the second set of visual representations, wherein the second default content view is a second organizational view of at least one application and computer content, and wherein the sensor input indicates a transition to the second computer system configuration.

## G.    '715 Claim 1

A customized user interface to display computer content on a display component of a computer system including a keyboard, the user interface comprising:

at least one processor operatively connected to a memory of the computer system;

a graphical user interface, executing on the at least one processor, configured to display the computer content on the display component of the computer system, the graphical user interface configured to:

display a plurality of views of a plurality of visual representations of computer content, wherein the computer content includes at least one of selectable digital content, selectable computer operations and passive digital content;

an execution component, executing on the at least one processor, configured to:

detect a current computer system configuration from at least a first computer system configuration where the keyboard is operable to receive input from an operator of the computer system to control the computer system and a second computer system configuration where the keyboard is inoperable to receive input from the operator of the computer system to control the computer system;

select one of the plurality of views for display on the computer system in response to the detected current computer system configuration; and

transition the display component to the selected one of the plurality of views.

## H.    '818 Claim 1

At least one non-transitory computer-readable storage medium storing processor-executable instructions that, when executed by at least one processor in a computer system comprising a display and a keyboard and being configurable between a plurality of computer system configurations, cause the at least one processor to perform a method comprising:

displaying a plurality of views of a plurality of visual representations of computer content;

detecting a current computer system configuration from at least a first computer system configuration of the plurality of computer system configurations where the keyboard is operable to receive input from an operator of the computer system to control the computer system and a second computer system configuration of the plurality of computer system configurations where the keyboard is inoperable to receive input

from the operator of the computer system to control the computer system;

selecting one of the plurality of views for display on the computer system in response to the detected current computer system configuration; transitioning to the selected one of the plurality of views; and

displaying the selected one of the plurality of views.

## I.    '888 Claim 1

A method for accessing and managing digital media libraries on a ***streamlined computing device*** with a plurality of selectable I/O profiles, the method comprising:

displaying a graphical user interface on the computing device, wherein the graphical user interface comprises at least a plurality of views of digital media content;

providing for transition between the plurality of views in response to selection of an I/O profile;

providing for transition between the plurality of views in response to activation of a view selector component configured to permit a user to select one of the plurality of views, wherein providing for the transition between the plurality of views in response to selection of the I/O profile includes:

permitting the user to rotate a display component of the computing device about a longitudinal axis running along an interface between the display component and a base of the ***streamlined computing device***;

wherein rotating the display component about the longitudinal axis from a closed mode to a first physical orientation configures the computing device into a laptop mode having a first physical configuration of the display component and the base, with one of the plurality of views as a default display; and

wherein rotating the display component about the longitudinal axis from the closed mode to a second physical orientation configures the computing device into another ***display mode*** having a second physical configuration of the display component and the base, with another one of the plurality of views as the default display;

associating at least one of a plurality of visual representations with digital media content;

executing the association with the at least one of the plurality of visual representations with digital media content in response to selection;

transitioning a display on the computing device to a view of the digital media content in response to the act of executing the association; and

providing for display of user digital media content and referenced digital media content in the view of the digital media content.


## III.    AGREED-UPON CONSTRUCTIONS

| No. | Patent(s) & Claim(s) | Terms | Agreed Construction |
| --- | --- | --- | --- |
| 1 | 9,880,715 claims 1, 17 | keyboard is inoperable to | keyboard is unable to receive input from the operator, which is different and distinct from the keyboard being |

| No. | Patent(s) & Claim(s) | Terms | Agreed Construction |
|---|---|---|---|
| | 10,564,818 claim 1 | receive input from the operator | physically oriented so that it is inaccessible to the operator |
| | 10,564,818 claim 11 | | |
| 2 | 9,563,229 claim 9 | means for rotating | Subject to 35 U.S.C. § 112 ¶6.<br><br>**Function**: rotating the display component along the longitudinal axis relative to the base to transition the portable computer for viewing in the frame mode<br><br>**Structure**: the hinge assembly having a single axis or multiple parallel axes as described at 2:12-20; 2:37-39; 2:65-3:3; 3:9-19; 4:6-13; 4:57-61; 4:64-65; 5:3-14; 5:53-60; 6:32-40; 6:52-63; 9:22-10:7; 10:24-11:18; FIGs. 1, 2, 4, 7A-10, 25-27 and its equivalents |
| 3 | 8,289,688 claim 11 | means for rotating | Subject to 35 U.S.C. § 112 ¶6.<br><br>**Function**: rotating the display component in a single direction relative to the base to configure the portable computer between a laptop mode and an easel mode<br><br>**Structure**: the hinge assembly having a single axis or multiple parallel axes as described at 1:64-2:6; 2:22-24; 2:49-54; 2:60-3:2; 3:57-64; 4:40-44; 4:47-48; 4:53-64; 5:33-39; 6:10-17; 6:28-38; 8:62-9:45; 9:61-10:53; FIGs. 1, 2, 4, 7A-10, 25-27 and its equivalents |
| 4 | 8,289,688 claims 17, 29-32 | determining a display mode | determining a display mode by distinguishing among all the portable computer's display modes |
| 5 | 9,880,715 claims 1, 2, 4, 14, 15, 17, 20 | views | ways of organizing visual representations of computer content (as distinct from, for example, merely changing the display orientation) |
| | 9,003,315 claims 1, 2, 4, 6-8, 24, 27, 28, 54, 57 | | |
| | 10,564,818 claims 1, 4, 11, 14 | | |
| | 8,612,888 claims 1, 24, 25, 26, 27 | | |

10

| No. | Patent(s) & Claim(s) | Terms | Agreed Construction |
|---|---|---|---|
| 6 | 8,612,888 Claims 1, 26, 27 9,003,315 Claims 1, 27, 28 | I/O profile | a set of input/output devices |

## IV.    DISPUTED CONSTRUCTIONS

### A.    Term 1: "Display Mode"

|  | LiTL's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Disputed Term:** display mode **Relevant Claims:** 8,289,688 Claims 17, 27, 29, 30 8,624,844 Claims 10, 16, 17 9,563,229 Claims 1, 3, 16, 18, 20, 25 10,289,154 Claims 1, 3, 4, 7, 11, 14 9,003,315 Claim 29 8,612,888 Claims 1, 25, 26, 27 | the overall physical configuration of (1) the display relative to the base and (2) the display or base relative to gravity | the particular physical configuration of the [portable computer / streamlined computing device]. Display modes may include laptop, easel, tablet, flat, frame, and closed modes |
| Why resolution of the dispute matters | Resolving the dispute could help avoid juror confusion. The term "display mode" is used in two dozen asserted claims across six patents. Defendants' proposal would introduce exemplary display modes that do not appear in many of the asserted claims in which the term "display mode" appears. Thus, LiTL's proposed construction provides jurors with greater clarity. | Adopting Defendants' construction of this term and the "plurality of display modes" term would be dispositive of infringement for all asserted claims of the '844 patent, and for asserted claim 17 of the '688 patent and its asserted dependent claims. Adopting plaintiff's construction could be dispositive of invalidity for all asserted claims of the '844 and '229 patents, and for asserted claims 17 (and its asserted dependent claims), |

| | | 30, 31, and 32 of the '688 patent. |
|---|---|---|

### 1.    Plaintiff's Opening Position

LiTL's proposed construction of "display mode" defines the core concept and clarifies the term's meaning in the multiple contexts where it appears – two dozen claims across six patents with three different specifications. By contrast, Defendants' proposed construction merely offers limiting examples that are not definitional and indeed are irrelevant in many of the claims.

As the specifications explain, display modes are differentiated from one another using two types of orientation information: (1) the display relative to the base and (2) the display or base relative to gravity. The angle of the display relative to the base is used to describe:

- laptop mode, i.e., from > 0° to < 180° ('688 Patent, 2:29-32, 4:40-42, FIG. 1);

- flat mode, i.e., 180° (*id.*, 5:38-39, 16:20-25, FIG. 27);

- closed mode, i.e., 0° (*id.*, 2:28-29, 4:43-44, FIG. 2);

- easel mode, i.e., from > 180° to < 360° (*id.*, 2:32-35, 4:47-50, FIGs. 4, 5); and

- frame mode, i.e., from > 180° to < 360° (*id.*, 5:35-37, 16:5-8, FIG. 26).

The display-to-base angle range for each display mode is illustrated below.





**Laptop Mode (> 0º to < 180º Angle of Rotation)**

FIG. 1



**Flat Mode (180º Angle of Rotation)**

180º Angle of Rotation

FIG. 27





Ex. 20, ¶79; Ex. 30, ¶83.

Because easel and frame modes have the same display-to-base angle range, the second type of orientation information (orientation of display or base relative to gravity) is also needed to differentiate these modes. *Compare* '688 Patent, 8:7-12 (easel mode) *with* 16:1-13 (frame mode).

During reexaminations of the '688 and '154 Patents, LiTL's expert explained how the specifications describe display modes in terms of the display-to-base angle (Ex. 20, ¶79; Ex. 30, ¶83), but that this angle alone is insufficient to distinguish frame from easel mode as it can be the same in both modes, as depicted above. Ex. 20, ¶¶80, 82; Ex. 30, ¶87. Similarly, on its own, the "orientation of [a] keyboard or screen relative to the earth's gravity … does not reliably indicate the device's current display mode," as the PTAB observed when denying Defendants' '229 IPR petition. Ex. 26, p. 19. Taken together, however, these two types of orientation information can distinguish display modes (e.g., easel vs. frame). Ex. 20, ¶¶83-85; Ex. 30, ¶¶88-89. LiTL's proposed construction captures this key concept, i.e., that what distinguishes one display mode from another is the ***combination*** of these two types of display orientation information (relative-to-base and relative-to-gravity).

Defendants' proposed construction omits this key concept. Instead, Defendants merely offer a list of examples of display modes. That is not a definition of the term. Indeed, their list would not even apply to many of the claims in which "display mode" appears. For example, Defendants' proposed construction includes "tablet mode" even though that term never appears in any asserted claim (nor in the '315 or '888 specifications). Similarly, "flat mode" does not appear in any of the asserted claims.

In sum, LiTL's proposed construction reflects the key concept used during post-grant proceedings to define "display mode." Defendants' proposal lacks this definitional concept and merely offers a list of examples several of which are irrelevant.

### 2. Defendants' Answering Position

"Display mode" appears in asserted claims in six of the eight asserted patents. Defendants' proposed construction is taken directly from LiTL's representations to the Examiner during re-examinations of the '688 and '844 Patents that "'display mode' refers to a particular

configuration of the portable computer, such as laptop mode, easel mode, or frame mode." Ex. 21, p. 6; *see also* Ex. 24, p. 6 ("The specification [of the '844 Patent] is clear that the term 'display mode' refers to the particular physical configuration of the portable computer… including: a 'tablet mode,' 'a closed mode, a laptop mode, an easel mode, a flat mode and a frame mode.'" (internal citations omitted)).  LiTL now objects to its own construction on the ground that "it is not a definition" but "a list of examples of display modes."  *Supra* at 15.  That objection is wrong as it is proper and helpful to include examples in a construction. *See Apple, Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846-LHK, 2012 WL 2993856, at *4 (N.D. Cal. July 20, 2012).  Also of note, the construction LiTL argued for to the Examiner contained a list of exemplary modes.[2]

　　In contrast to Defendants' clear, concise proposed construction of "display mode," LiTL offers a definition that goes beyond stating what a "display mode" *is*, but also dictates how a particular "display mode" *is to be determined*.  LiTL urges the Court to adopt the construction of "display mode" as a "physical configuration of (1) the display relative to the base and (2) the display or base relative to gravity."  Ex. 1, p. 1.  LiTL's construction is improper because it is contrary to the construction provided to the Examiner and adds concepts that are covered by other claim terms.

　　For example, claims 17 of the '688 Patent recites "determining a degree of rotation of the single display component relative to the base" and "determining a display mode based, at least in part, on… the degree of rotation…."  Claim 29 of the '688 Patent similarly recites "determining

---

[2] LiTL takes issue with the fact that Defendants' construction lists modes that do not explicitly appear in asserted claims, "tablet mode" and "flat mode."  *Supra* at 15.  This does not make the list improper.  The language that precedes the list—"display modes *may include*"—makes it abundantly clear that the identified "display modes" are exemplary and are not a definitive itemization of "display modes" covered by the patents.

a display mode responsive to the physical configuration of the single display component relative to the base." Adopting LiTL's construction in view of the scope of these other related terms would create redundancy and confusion. Indeed, most display modes (*e.g.*, closed mode and laptop mode) do not depend on the configuration of either the display or the base relative to gravity.

Finally, LiTL's inclusion of language regarding the detection and determination of modes in the definition of "display mode" is precisely what LiTL identifies as "legal error" when arguing against Defendants' proposed construction of "plurality of display modes." Specifically, LiTL imports into "display mode" limitations relevant to the separate "generating" and "detecting" limitations. *Infra* at 20. LiTL cannot have it both ways.

The definition of "display mode" that LiTL gave to the Examiner is correct and should be adopted.

### 3.  Plaintiff's Reply Position

The parties agree that "display mode" refers to a device's "physical configuration." They disagree over what comes next: Defendants propose a non-comprehensive list of certain possible display modes. LiTL proposes ***criteria*** by which display modes are distinguished from one another. As Defendants concede, only LiTL's approach clarifies "how a particular 'display mode' is to be determined" (*supra* at 16). Defendants admit their "construction lists modes that do not explicitly appear in asserted claims" (*Supra* at 16 n.2) – i.e., that are irrelevant. Appending irrelevant examples to a construction would be unhelpful if not misleading to the jury.

Contrary to Defendants' argument (*supra* at 16-17), LiTL's construction of Term 1 is not redundant with the "determining" limitations because, unlike those limitations, it does not require "determining" a display.

17

4.        **Defendants' Sur-Reply Position**

LiTL's argument that Defendants' construction adds "irrelevant examples" of possible modes conflicts with its statements during prosecution that "display mode" includes "tablet mode," "closed mode," and "flat mode"—the same modes LiTL now contends are "irrelevant." *E.g.*, Ex. 24, p. 6. LiTL cannot escape its prior statements.

LiTL makes no attempt to rebut Defendants' showing that inclusion of the "relative to gravity" phrase is not supported and would cause confusion. LiTL only takes issue with Defendants' assertion that its construction would cause redundancies with other claim terms, an assertion to which LiTL responds by saying its construction is not redundant. Defendants' proposed construction of "display mode" is supported; LiTL's is not.

B.        **Term 3: "Plurality of Display Modes"**

| | LiTL's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Disputed Term:** plurality of display modes<br><br>**Relevant Claims:**<br>8,289,688 Claims 17, 29, 30<br><br>8,624,844 Claim 10<br><br>9,563,229 Claims 1, 16, 18<br><br>10,289,154 Claims 1, 11<br><br>9,003,315 Claim 29 | No construction necessary.<br><br>The full preambles of claim 10 of the '844 patent and claims 1, 16, and 18 of the '229 patent are not limiting.<br><br>In the alternative:<br>The plain and ordinary meaning of the phrase is "two or more of the display modes."<br><br>For LiTL's proposed construction of "display modes," see Term 1 above. | all of the display modes supported by the portable computer<br><br>The full preamble of claim 10 of the '844 patent in which this term appears is limiting.<br><br>Dell: all of the display modes supported by the portable computer, including at least, closed mode, laptop mode, flat mode, easel mode, frame mode, and tablet mode<br><br>Dell also proposes that the full preamble of claim 10 of the '844 patent and claims 1, 16, and 18 of the '229 patent in which this term appears is limiting. |

| Why resolution of the dispute matters | Once "display mode" is defined (see Term 1) there is no remaining dispute to resolve, as the meaning of the term "plurality" (two or more) is clear and well-established in Federal Circuit law.<br><br>There is a dispute to resolve over whether the preambles of claim 10 of the '844 patent and claims 1, 16, and 18 of the '229 patent are limiting. Resolving that dispute could affect whether Defendants assert certain noninfringement and invalidity defenses. | Defendants' explanation:<br>Adopting Defendants' construction of this term and the "display modes" term would be dispositive of infringement for all asserted claims of the '844 patent, and for independent claim 17 of the '688 patent and all its dependent claims.<br><br>Dell's explanation:<br>Adopting Dell's proposed construction of "plurality of display modes" and its proposal to find the full preambles to claim 10 of the '844 patent and claims 1, 16, and 18 of the '229 patent to be limiting would be dispositive of infringement as to Dell for all asserted claims in the '229 and '844 patents; claims 17, 29, and 30 of the '688 patent, and claims 1 and 11 of the '154 patent. |

### 1. Plaintiff's Opening Position

Once the term "display mode" is construed (see Term 1), there is no need to separately construe the phrase "plurality of display modes," which merely adds the term "plurality" that has a well-established meaning ("two or more") under Federal Circuit law.

Defendants' additional contention that certain preambles in which the term appears are limiting should be rejected as inconsistent with Federal Circuit law.

a. Defendants' Proposed Construction is (a) Unnecessary; and (b) Erroneous as Inconsistent with the Prosecution History.

The phrase "plurality of display modes" requires no construction because it incorporates the disputed term "display mode" whose resolution (*see* Section IV.A.1 *supra*) suffices. If any

construction of "plurality" were needed, the Federal Circuit has long held that, absent contrary indication, "plurality" means "two or more items." *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327–28 (Fed. Cir. 2001). Thus, the plain and ordinary meaning of the phrase "plurality of display modes" is "two or more display modes," where "display modes" should be construed as discussed above.

Defendants' proposed construction turns that meaning on its head by seeking to redefine "two or more" as "all." There is no support in the specification for such a drastic deviation from the ordinary meaning of the term "plurality."

Defendants apparently intend to argue that their construction is supported by statements LiTL made in post-grant proceedings. But Defendants take those statements out of context. LiTL argued that prior art failed to disclose limitations in claims of the '229 and '688 Patents that require ***generating*** information indicative of a display mode or ***determining*** a display mode from among the plurality of display modes, respectively. Defendants invite legal error by seeking to extend LiTL's statements regarding the "generating" and "detecting" limitations to ***other*** limitations merely because they contain the phrase "plurality of display modes."

During IPR proceedings involving the '229 Patent, the PTAB agreed with LiTL that the prior art failed to disclose the limitation in '229 claim 1 requiring "an accelerometer configured to ***generate*** orientation information indicative of a current display mode among the ***plurality of display modes*** of the portable computer." Ex. 26, pp. 17-18.[3] LiTL explained that the base-to-display angle "is insufficient to differentiate between" the frame and easel modes, but that combining this information with the orientation of the base and/or the display relative to gravity "is sufficient to distinguish among all the display modes of the computer described in the '229

---

[3] All emphasis herein is added unless otherwise indicated.

Patent." Ex. 25, p. 16. LiTL made similar arguments regarding '229 claims 16 and 18. Ex. 27, pp. 24-28, 54. The PTAB agreed with LiTL and, on that basis, denied institution of Defendants' IPRs. Ex. 26, pp. 17-23; Ex. 28, pp. 18-27. LiTL made similar arguments with respect to limitations in '688 claims 17 and 29 that require "***determining*** a display mode." Ex. 23, p. 22.

Consistent with this prosecution history, the parties have stipulated that the phrase "determining a display mode" in '688 claims 17 and 29-32 requires "determining a display mode by distinguishing among all the portable computer's display modes." *See supra* Section III (Agreed Term No. 4). Likewise, although the parties dispute the meaning of "an accelerometer" in Disputed Term No. 5, they stipulate that the remainder of the limitation (which concerns "generating" orientation information) should be given the meaning LiTL articulated in IPR. *See infra* Section IV.D.2.

Defendants' error lies in contending that construing the '229 and '688 claims to require distinguishing among ***all*** of the portable computer's display modes is part of the ***definition*** of the phrase "plurality of display modes." It is not. That limitation thus cannot be imported into every other claim that happens to contain that phrase.

Indeed, the argument makes no sense, as the "determining" limitations of '688 claims 17 and 29 and the "generating" limitations of '229 claims 16 and 18 ***do not even include the phrase*** "plurality of display modes." Yet (as LiTL argued and the PTAB agreed) it is these "determining" and "generating" limitations that require distinguishing among "all" supported display modes. Ex. 23, pp. 21-22; Ex. 27, p. 26.

Defendants' proposal would also violate canons of construction. Defendants argue in their discovery responses that under their proposed construction, the "orienting" step of '688 claim 17 – which requires "orienting the visual display shown on the display screen … towards

an operator … in each of the ***plurality of display modes***" – would be impossible to perform because it could not be done in "closed mode" (one of "the display modes supported by the portable computer."). Ex. 41, pp. 13-14.

If a proposed construction "renders the claimed invention inoperable," the Federal Circuit has instructed it "should be viewed with extreme skepticism." *AIA Eng'g v. Magotteaux Int'l*, 657 F.3d 1264, 1278 (Fed. Cir. 2011). This Court has likewise held that such constructions are disfavored, *Bioverativ v. CSL Behring*, No. 17-914-RGA, 2019 WL 1276030, at *5 n.3 (D. Del. Mar. 20, 2019), and that given the "impossibility" of implementing a defendant's proposed construction, "a person of ordinary skill in the art would [not] read the claim language to mean" what defendant proposes. *Ansell Healthcare Prods. v. Reckitt Benckiser*, No. 15-915-RGA, 2018 WL 620968, at *3 (D. Del. Jan. 30, 2018).

Defendants' proposal creates a similar anomaly with regard to '844 claim 10, which requires viewing a display screen "in each of the plurality of display modes." Defendants aver in discovery responses that, under their construction of "plurality of display modes," this limitation would require the operator to be able to do the impossible, i.e., view the display in closed mode. Ex. 41, p. 18. Under Federal Circuit law, however, such a construction is to be viewed with "extreme skepticism."

> b.   The Phrase "Plurality of Display Modes" in the Preambles Is Not Limiting

Defendants argue that the phrase "a plurality of display modes," where it appears in the preambles of '229 claims 1, 16, 18 and '844 claim 10, is limiting.

The preambles recite "a portable computer [configurable between / having] a plurality of display modes." '229 claims 1, 16, 18; '844 claim 10. In each of these claims, deleting the phrase "configurable between [or having] a plurality of display modes" from the preamble "does not

affect the structure or steps of the claimed invention" because the remaining portions of the claims (i.e., the rest of the preamble and the claim bodies) describe a structurally complete invention. Accordingly, it is not limiting. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002).

For example, the remaining portions of the '229 claims describe a display, base, accelerometer, laptop mode, easel mode, frame mode, and how transitioning among modes changes functionality (e.g., disabling keyboard, enlarging content, determining a display orientation). The disputed preamble language "is used merely to give a descriptive name to those components as a whole. It does not provide essential structure to the claimed invention or any context essential to understanding those components." *Sentient Sensors v. Cypress Semiconductor*, No. 19-1868-MN, 2021 WL 289410, at *5 (D. Del. Jan. 28, 2021).

### 2. Defendants' Answering Position

LiTL disclaimed any construction of "plurality of display modes" as meaning any "two or more" display modes by arguing in an IPR that this term must include *all* modes supported by the portable computer. As a result, LiTL cannot now recapture a broader construction that requires any two display modes. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F. 3d 1353, 1360 (Fed. Cir. 2017) (extending prosecution disclaimer doctrine to IPRs).

Claim 1 of the '229 Patent recites "an accelerometer configured to generate orientation information indicative of a current display mode among *the plurality of display modes* of the portable computer." If "plurality of display modes" means "two or more display modes" as LiTL now contends, generating information indicative of *any two* expressly claimed display modes (laptop, frame, and easel) would suffice. But LiTL argued that this claim interpretation "fails as a matter of claim construction":

> The Petition alleges that to meet [the "accelerometer… plurality of display modes" limitation], it must only be shown that [prior art] Lane's mechanism generates 'unique orientation information in each of the [] *claimed* modes (*i.e.*, laptop, frame, and easel).' That assertion fails as a matter of claim construction. … Claim 1 does not limit the claimed computer's 'plurality of display modes' to the laptop, frame, and easel modes. Indeed, the [preamble] explicitly contemplates that the computer may have additional display modes.

Ex. 25, p. 25 (emphasis in original). LiTL argued that because Lane discloses that its computer also supports additional display modes, including the unclaimed tablet and flat modes, "the plurality of display modes is correctly understood to *include* Lane's flat mode and/or Lane's tablet mode." *Id.*, p. 27. LiTL concluded that "[t]he Petition's failure to address some of the 'plurality of display modes of [Lane's] portable computer' (flat mode and tablet mode)… is fatal under the proper construction of claim 1." *Id.*, p. 30. Thus, in arguing that Lane could not meet the "plurality of display modes" limitation unless *all* modes that Lane *disclosed* as being supported by the Lane computer were included in the construction of the term, LiTL disavowed a construction of "plurality of display modes" as meaning any "two or more display modes." *Tech. Props. Ltd. v. Huawei Techs. Co.*, 849 F.3d 1349, 1358-59 (Fed. Cir. 2017) (finding disclaimer based on arguments distinguishing prior art).

LiTL tries to avoid the consequences of these arguments by asserting that they relate to "generating" and "determining" claim limitations rather than "plurality of display modes." *Supra* at 20-21. This is wrong. LiTL made multiple independent arguments in its '229 POPR. Ex. 25, p. 24. The disclaimer in the first argument discussed above is based on the assertion that "plurality of display modes" must be construed to include all supported modes including the flat and tablet modes. That LiTL made disclaimers in other arguments does not negate this first disclaimer. *See Tech. Props.*, 849 F.3d at 1358 (the "district court's construction properly includes both of patentee's clear disclaimers"). LiTL's assertion that its disclaimer cannot be

extended to other limitations reciting "plurality of display modes" (*Supra* at 21) fails because "unless otherwise compelled… the same claim term in the same patent or related patents carries the same construed meaning." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003).

LiTL identifies certain limitations—other than "plurality of display modes"—that the parties agree should be construed to require distinguishing among all supported modes. *Supra* at 20-21. But LiTL ignores that, although it is true that "plurality…" does not appear within those limitations, it does appear in the surrounding claim language. For example, claim 16 of the '229 Patent recites "generating, by an accelerometer, orientation information indicative of an orientation of the device" followed by "determining a current display mode of the plurality of display modes based on the orientation of the device." The claimed "determining" step is based on the orientation of the device as indicated by the orientation information generated by the "generating" step. To distinguish claim 16 over Lane in the '229 POPR, LiTL repeated the same disclaimer that "plurality of display modes" must encompass all display modes supported by the device. Ex. 27, pp. 56-60, 65. Thus, in order to differentiate among all supported display modes (that LiTL argued is required in the "determining" step), the orientation information generated in the "generating" step must be sufficient to differentiate between all display modes. It is the disclaimer for "plurality of display modes" that forms the basis for Defendants' agreement that "generating" in claim 16 requires differentiating among all supported modes.

LiTL states that Defendants' construction renders the claimed invention "inoperable" and cites cases for the proposition that such constructions are disfavored. *Supra* at 22 (citing HP's non-infringement contention). LiTL's argument is flawed by improperly equating non-

infringement with claim inoperability. To the extent the claims are rendered inoperable, those cases are distinguishable at least because none of them involve a disclaimer of claim scope.

*      *      *

a.    **Dell's Answering Position**

Dell contends that the construction of "plurality of display modes" must include the display modes that LiTL has asserted in the prosecution history are disclosed by the '229 Patent. "The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent." *Springs Windows Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003). In the '229 IPR, LiTL explained that the '229 Patent disclosed a portable computer that is configurable among "different display modes [which] correspond to different physical configurations." Ex. 25, pp. 9-10. LiTL then explained the '229 Patent disclosed the following 6 display modes, followed by 3 pages of illustrated figures and citations from the '229 Patent:

> As illustrated in the annotated images below, in "***closed mode***" the display component is "disposed substantially against the base" ('229 Patent, 2:43-45); in ***laptop mode*** the display component is rotated beyond the "closed" angle (approximately 0º) to an angle that is less than the "flat" angle (approximately 180º) (*id.*, 11:12-15, 18:7-11); in "***flat mode***" the display component is "rotated (or opened) to approximately 180 degrees with respect to the base component" (*id.*, 16:62-66); and in both the "***easel mode***" and "***frame mode***" the display component is rotated further than the "flat" angle of approximately 180º to an angle beyond approximately 270º (*id.*, 11:15-18, 16:44-56, 18:16-21).

Ex. 25, pp. 9-14 (emphasis in original). Furthermore, LiTL stated that the "['229] Patent disclosed a 'tablet mode,' where the display component is 'rotated and folded against the base' component. '229 Patent, 1:57-60." Ex. 25, p. 9. Nowhere does LiTL say these 6 modes are merely exemplary.

LITL provided a similar explanation in its opening claim construction brief, specifying that its patents teach closed, laptop, easel, flat, and frame modes. *Supra* at 1-2,[4] 12. Finally, LiTL again identified all these display modes as being part of the invention in the '688 EPR. LiTL's appeal brief argued that "the '688 Patent describes sensors that provide sufficient information to *differentiate among all the computer's display modes* so the computer can identify the current display mode and transitions between display modes the user has configured the computer into" and that a POSITA would know how to differentiate among all the computer's display modes—closed, flat, laptop, easel, and frame modes—under the '688 Patent. Ex. 46, pp. 14, 26-29 (citing Bear Decl. ¶79).

LiTL's primary rebuttal is that Dell's proposed construction exceeds what the claims require. *Supra* at 18-19. But as discussed above, LiTL argued during the '229 IPR that limiting the "plurality of display modes" to just the "claimed modes", i.e., laptop, frame, and easel modes "fails as a matter of claim construction." Ex. 23, p. 25. LiTL then argued that the '229 IPR should be denied because it did not address each of *Lane's* disclosed display modes, which include flat and tablet. *Id.*, pp. 25-27. This argument only matters if the "plurality of display modes" limitation requires the claimed portable computer to have the full "plurality of display modes" that LiTL asserts are *disclosed* in the specification of the '229, '688, and '844 Patents, not just the modes explicitly recited elsewhere in the asserted claims of these patents.

Based on LiTL's repeated representations, "plurality of display modes" must at least include closed, laptop, flat, easel, frame, and tablet modes.

---

[4] The '229 Patent is a continuation of the '688 Patent and shares the same specification.

### 3.    Plaintiff's Reply Position

a.    Defendants' Proposed Construction Fails.

Defendants admit that the plain and ordinary meaning of "plurality" is "two or more" (*supra* at 23-24), but argue that LiTL disclaimed that meaning through statements made in the '229 IPR. But those statements were not a disclaimer of the meaning of ***the phrase in dispute here***. Rather, LiTL's statements related to the meaning, in context, of the ***entirety*** of certain "determining…" limitations (e.g., Disputed Term 5). As LiTL pointed out in the IPR, those limitations, ***taken as a whole***, do indeed require generating "orientation information sufficient to differentiate between all display modes supported by the portable computer" – but not because they happen to contain the phrase "plurality of display modes" (a phrase that does not intrinsically impose any such requirement) but because those limitations recite "determining" or ("generating information indicative of") "***a current display mode***" from among the computer's plurality of display modes. Doing that (i.e., detecting which among the possible modes is the current one) ***does*** require distinguishing among all the display modes – but the mere phrase "plurality of display modes" does not alone require doing so.

Defendants' disclaimer theory effectively seeks to import into the short phrase "plurality of display modes" substantive limitations that appear elsewhere. Going even further, they then seek to apply those imported limitations indiscriminately to each and every term in which the phrase "plurality of display modes" appears (i.e., twenty instances spanning five patents) – regardless of whether those terms contain those limitations. That is not how claim construction works. That certain limitations require A+B does not make B part of the *definition* of A and does not require the presence of B every time a limitation requires just A.

Defendants dispute that LiTL's IPR statements "relate to 'generating' and 'determining' claim limitations rather than 'plurality of display modes.'" *Supra* at 24. But each of the IPR

statements that Defendants cite concerns the "generating" or "determining" limitations of the '229 claims. *Supra* at 24-25 (citing Ex. 25, pp. 24, 25, 27, 30 ("generating" limitation [1c]) and Ex. 27, pp. 56-60, 65 ("determining" limitation [16d])).

Defendants cite *Omega* for the proposition that disclaimer in one claim can attach to "the same claim term in the same patent or related patents." But even if, arguendo, LiTL's IPR statements amounted to a disclaimer, they do not concern the "same claim term." *Supra* at 24-25. LiTL's IPR statements concerned the longer "generating" and "determining" limitations, only a snippet of which is the phrase "plurality of display modes." Defendants seek to apply LiTL's statements to 17 other limitations that contain the term "plurality of display modes" but do ***not*** contain the "generating" or "determining" language. Those are not the "same claim term."

Defendants repeat the error of the defendant in *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, who argued that prosecution statements about the scope of the phrase "heading signal" in claims that recited "a substantially fixed relationship to said propulsion device" supported a narrow construction of "heading signal" in claims that lacked the "substantially fixed" language. 175 F.3d 985, 991-92 (Fed. Cir. 1999). Here, likewise, LiTL's IPR statements about the scope of the shorter phrase "plurality of display modes" do not support a narrowed construction of that phrase where it appears ***without*** the "generating" and "determining" language.

Defendants' proposal is also disfavored because, at least according to Defendants' invalidity contentions, it would render certain claims non-enabled. Defendants contend that '844 claim 10 (discussed at *supra* at 22-23) is not enabled under their proposed construction. Ex. 50, p. 108. Federal Circuit cases disfavor constructions that render claims inoperable (*supra* at 22). Defendants argue that those cases did not involve disclaimer (*supra* at 25), but cite no authority that the doctrine is inapplicable where disclaimer is alleged.

29

Absent the "clear and unmistakable" disclaimer upon which Defendants' proposed construction depends, the term "plurality" should be given its plain and ordinary meaning (which is undisputedly "two or more").

> b.    Dell's Proposed Construction Fails.

Dell proposes a separate construction[5] that adds to the above flaws an additional problem by requiring that "the plurality of display modes" necessarily includes the six display modes disclosed in the '229 Patent.

Because Dell points to the same LiTL statements in the '229 IPR as Defendants (*supra* at 27 (citing Ex. 25, pp. 25-27)), Dell's proposal should be rejected for the reasons detailed above.

Dell adds to the Defendants' proposed construction that "all of the display modes supported by the portable computer" include at least six display modes disclosed by the '229 Patent. Dell focuses on LiTL's argument "that the '229 IPR should be denied because it did not address each of [prior art] *Lane's* disclosed display modes." *Supra* at 27 (emphasis Dell's). Dell misunderstands the import of LiTL's argument and the PTAB's decision adopting it.

As LiTL explained to the PTAB, because Defendants' IPR petition "maps the claimed 'portable computer' to Lane's computer," Defendants had to show that Lane addressed each of Lane's computer's display modes. Ex. 25, pp. 25-26. That is, the phrase "the plurality of display modes of the portable computer" in Limitation [1c] is context-specific: It refers to the display modes of whichever "portable computer" (which could be an accused or prior-art computer) the claims are being mapped onto. The PTAB found that Defendants failed to make that showing as to Lane's computer. Ex. 26, pp. 19-20.

---

[5] Apparently, none of the other defendants was willing to embrace Dell's flawed argument.

Dell's proposed construction that "all of the display modes supported by the portable computer" necessarily includes at least the six display modes disclosed in the '299 patent ignores LiTL's argument – with which the PTAB agreed – that the relevant display modes are context-specific (i.e., depend on which computer the claims are being mapped onto). Ex. 25, pp. 25-26; Ex. 26, pp. 18-23.

### 4.     Defendants' Sur-Reply Position

**<u>Defendants' Construction.</u>** LiTL argues that the "generating" and "determining" limitations "recite 'determining' or ('generating information indicative of') 'a current display mode' from among the computer's plurality of display modes," and that "[d]oing that (i.e. detecting which among the possible modes is the current one) ***does*** require distinguishing among all the display modes…." *Supra* at 28 (emphasis in original). But LiTL gets it backwards—the set of "plurality of display modes" defines what the "generating" and "displaying" limitations must distinguish, not the other way around. To save its claims in IPR, LiTL expressly defined "plurality of display modes" as <u>all</u> of Lane's display modes. LiTL used this definition to argue that Lane does not distinguish between <u>all</u> device-supported display modes instead of any two of them (the construction LiTL now seeks). LiTL now wants recapture what it disclaimed to support its infringement allegations at trial. The law prohibits this. *See Aylus*, 856 F. 3d at 1360.

LiTL's argument regarding *Johnson Worldwide* wrongly conflates cause and effect: in the IPR, LiTL used the meaning of "plurality of display modes" as the premise to limit the "generating" and "determining" limitations, not the opposite. And LiTL does not dispute that a patentee can make multiple disclaimers—precisely what LiTL did to preserve validity of the '229 patent. *Tech. Props.*, 849 F.3d at 1358. In the same vein, having clearly defined the scope of "plurality of display modes," *Omega Engineering* applies. 334 F.3d at 1334. And LiTL's argument that it is disfavored for constructions to result in non-enablement still fails. Such

constructions are "disfavored"—not barred—and LiTL cites no authority stating the doctrine could override clear disclaimer. LiTL chose to narrow "plurality of display modes" and must stick to this definition.

**Dell's Construction.** This phrase requires the six display modes that LiTL argued are disclosed in the '229 Patent. This is necessary to satisfy the notice function of the '229 Patent and its prosecution history. LiTL argued in the '229 IPR that it would "fail as a matter of claim construction" to limit "plurality of display modes" to just the laptop, easel, and frame modes because claim 1 "explicitly contemplates that the computer may have additional display modes." Ex. 25, p. 25. LiTL identified these additional modes to this Court and to the Patent Office as closed, flat, and tablet. Ex. 25, pp. 9-14; *Supra* at 1-2, 12; Ex. 46, p. 14, 26-29.

Moreover, when LiTL distinguished the Lane reference in the IPR, LiTL applied the "display modes" of the '229 Patent, not definitions found in Lane: "Several of Lane's configurations ***correspond to the above-discussed display modes of the '229 Patent*** (*supra* §II), including Lane's closed mode (Fig. 5), laptop mode (Fig. 6), flat mode (Fig. 7), easel mode (Fig. 8), tablet mode (Fig. 9), and frame mode (Fig. 25)." Ex. 25, pp. 18-19 (emphasis added). Finally, contrary to LiTL's suggestion (*supra* at 4), the PTAB did not agree with LiTL's construction or construe this phrase. LiTL's cited pages show that the PTAB thought Lane only disclosed one accelerometer and could not determine the relative orientation of the keyboard and display. Ex. 26, pp. 18-19.

### C. Term 2: "Means for Detecting"

|  | **LiTL's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|---|
| **Disputed Term:** means for detecting | Subject to 35 U.S.C. § 112 ¶ 6. | Subject to 35 U.S.C. § 112 ¶ 6. |
| **Relevant Claims:** | **Function**: LiTL agrees with Defendants' proposed functions. | **Function**: detecting an orientation of the base relative |

| 8,289,688 Claim 11 | | |
|---|---|---|
| | **Structure**: the orientation sensor or mode sensor as described at 2:28-54; 3:19-25; 6:10-17; 8:7-61; 9:19-45; 10:46-53 and their equivalents | to the display component and identify the transition between the laptop mode and the easel mode based on a stored threshold orientation<br><br>**Structure**: detent incorporated into the hinge assembly to detect movement of the hinge assembly and to translate the movement into information about the relative orientation of the display component 102 and the base component 104 and their equivalents |
| **Why resolution of the dispute matters** | The parties agree that this term is subject to 35 U.S.C. § 112 ¶ 6 and they agree on the function; the dispute concerns the structure. LiTL expects that resolving the scope of the structure could affect whether Defendants assert certain noninfringement and invalidity defenses. | Adopting Defendants' construction of this term would be dispositive of infringement for asserted claim 11 of the '688 patent. |

### 1.    Plaintiff's Opening Position

The parties agree that the phrase "means for detecting" is subject to §112, ¶6 and agree on the claimed function but dispute the scope of the corresponding structure.

LiTL's proposed structure includes all structure identified by the examiner during original prosecution and by Lenovo's expert during IPR proceedings. By contrast, Defendants' proposed structure is limited to a single sensor configuration, and thus excludes most of the detection embodiments disclosed in the '688 specification (including most of the structure identified by the examiner and by Lenovo's expert). Defendants' proposed construction invites legal error. *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999) (reversing judgment of noninfringement due to erroneous claim construction: "When multiple

embodiments in the specification correspond to the claimed function, proper application of §112, ¶6 generally reads the claim element to embrace each of those embodiments.").

During original prosecution, the examiner identified the corresponding structure for the "means for detection" term as the "sensor which is … described in paragraphs 0011, 0015, 0059-0061 and 0063." Ex. 10, LITL00245181. This corresponds to '688 Patent, 2:36-54, 3:19-25, 8:7-61, 9:19-45. *Compare* Ex. 37 *with* Ex. 2 ('688 Patent). In Lenovo's IPR petition, its expert identified much the same structure. Ex. 15, ¶110 ("The corresponding structure for the above-discussed means for detecting limitations includes at least the orientation or mode sensor described in the specification of the '688 Patent at 2:28-54, 3:19-25, 8:7-61, 9:19-45, 10:46-53 and its equivalents."). LiTL's proposal includes these detection embodiments; Defendants' proposal, by contrast, excludes most of them.

Defendants' proposal improperly limits the corresponding structure to a single sensor configuration in which detents are incorporated into the hinge assembly. '688 Patent, 9:36-45. Defendants' proposal excludes multiple embodiments that perform the claimed function (i.e., 2:28-54, 3:19-25, 6:10-17, 8:7-61, 9:19-45, 10:46-53, and their equivalents), which violates the Federal Circuit's admonition that "each of those embodiments" are part of the corresponding structure. *Micro Chem.*, 194 F.3d at 1258; *see also Versa v. Ag-Bag Int'l*, 392 F.3d 1325, 1329 (Fed. Cir. 2004) (reversing claim construction that excluded embodiments from corresponding structure); *Viatech Techs. v. Microsoft*, No. 14-1226-RGA, 2016 WL 3398025, at *10-11 (D. Del. June 14, 2016) (rejecting a narrower proposed construction that excluded embodiments: "Claim construction under §112, ¶6 requires identifying all structures, including all disclosed embodiments, that perform the claimed function.").

### 2. Defendants' Answering Position

The parties agree that the "means for detecting" is means-plus-function and agree on the recited function. The only dispute is over what constitutes corresponding structure. The parties agree that the detent mechanism disclosed at 9:36-45 of the '688 Patent constitutes corresponding structure for the "means for detecting." The dispute is whether the single disclosed accelerometer is also corresponding structure. It is not, because "[s]tructural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations." *Asyst Techs., Inc. v. Empak, Inc.*, 268 F. 3d 1364, 1370 (Fed. Cir. 2001).

The specification discloses an orientation or mode sensor incorporated into the base or the display, but not both: "The orientation sensor may be incorporated into the base component… or into the display component. In one example, locating the orientation sensor in the display component 102, rather than the base 104, may provide more robust detection…." '688 Patent, 8:23-26. The specification further discloses "the orientation sensor includes an accelerometer…" (*id.*, 8:32-33), meaning that in this embodiment, the accelerometer (part of the orientation sensor) is located in the base or the display, but not both.[6] Importantly, the specification does not disclose any embodiments that have accelerometers in *both* the base and the display. Notably, the Examiner in the '688 Patent reexamination agreed:

> The Examiner notes that the '688 Patent does not disclose the use of **two** accelerometers nor provide any disclosure of having an accelerometer **in each** of the base **and** display.
> …
> As seen above, only one orientation sensor which may include an accelerometer is used in the '688 Patent and it is either in the base **or** the display, not both.

---

[6] The specification uses the terms "orientation sensor" and "mode sensor" interchangeably (*see* '688 Patent, 8:17-20) and those sensors include "an accelerometer" (*id.*, 8:32-33).

Ex. 22, pp. 16-17 (emphasis in original).

Under *Asyst*, a single accelerometer disclosed in the specification is not an adequate corresponding structure because it cannot perform the agreed function of "detecting an orientation of the base relative to the display component…." Ex. 1, p. 4. LiTL and its expert *agree* that the single disclosed accelerometer cannot perform this function: "During the interview, Examiner Escalante asked whether a single accelerometer could detect the display modes. Mr. Bear [LiTL's expert] explains why the answer is no." Ex. 21, p. 18. Section VIII.E of the expert's declaration ("A Single Accelerometer Cannot Detect the Angle Between the Display and the Base") is unequivocal: "[I]n no circumstance could a single accelerometer in the absence of any other sensor… be able to know the relative delta angle between the base and display." Ex. 20, ¶90; *see also id*., ¶¶86-90. This is because using accelerometers to determine the relative angle of two objects (such as a base and a display) requires at least one accelerometer in each object. *Id*., ¶76.

LiTL contends that 6:10-17 (interchangeably using singular and plural elements) is part of the "corresponding structure," but this is wrong. First, there is no clear linkage between this disclosure and the recited function. Second, even if the singular accelerometer were replaced by multiple accelerometers, they would all be located in either the base or the display and would not perform the recited function. *Id.*, ¶76.

Because an accelerometer (or even multiple accelerometers) in either the base or the display cannot perform the recited function, it does not constitute adequate corresponding structure. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1352 (Fed. Cir. 2015); *Asyst Techs*., 268 F. 3d at 1370. The Court should therefore adopt Defendants' construction, which correctly excludes the structure that cannot perform the recited function.

### 3.      Plaintiff's Reply Position

The parties dispute the scope of the corresponding structure for the term "means for detecting." Defendants interpret the sensors disclosed in the specification as limited to a single accelerometer and argue that "a single accelerometer … is not an adequate corresponding structure because it cannot perform the agreed function." *Supra* at 36. Defendants' proposal has two fundamental flaws: (1) it would exclude sensors that were identified as corresponding structure by two USPTO examiners and Lenovo's IPR and EPR experts; and (2) the intrinsic evidence demonstrates the disclosed sensors are not limited to a single accelerometer.

Defendants do not address, much less dispute, that LiTL's proposed construction "includes all structure identified by the examiner during original prosecution and by Lenovo's expert during IPR proceedings." *Supra* at 33. LiTL's construction is also nearly identical to structure identified by a ***second*** Lenovo expert (Ex. 17, ¶ 51) and a reexamination examiner. *Compare* Ex. 1, p. 4 *with* Ex. 22, p. 11.  By contrast, Defendants' proposal excludes all of the sensor structure identified by two USPTO examiners and two ***defense*** experts during IPR and EPR.

Defendants argue the disclosed sensors are not corresponding structure under *Asyst* because they "cannot perform the agreed function of 'detecting an orientation of the base relative to the display.'" *Supra* at 36. Nothing in *Asyst* supports Defendants' circular tactic of adopting an interpretation of the specification that renders the disclosed structures inoperable and then, on that basis, excluding them from the definition of "corresponding structure."

Defendants contend that the specification lacks support for embodiments that have accelerometers in both the base and the display. *Supra* at 35. During reexamination proceedings, however, LiTL's expert explained the opposite was true:

> In 2008, a POSITA would have understood that **the '688 Patent teaches placing sensors in both the base and the display** to distinguish between frame mode (depicted in Figure 26 and easel mode (depicted in Figure 5) ….

Ex. 20, ¶ 80. He further explained that the '688 Patent teaches locating these sensor components "in the display, the base, **and/or** the hinge to determine the display mode." *Id.*, ¶ 78 (citing '688 Patent, 8:20-26, 8:38-44, 9:30-45). In other words, a POSITA would have understood the '688 Patent to disclose placing sensor components in **any combination of these locations**.

Defendants cite a reexamination examiner's bald assertion that the '688 Patent does not disclose "having an accelerometer in each of the base and display." *Supra* at 35. But that reading is contradicted by the expert's above-quoted testimony – a point LiTL explained to the PTAB. *See* Ex. 23, pp. 29-30.

Defendants also ignore an embodiment the expert discussed (Ex. 20, ¶ 78) that discloses "an orientation sensor (not shown) that is configured to detect a relative orientation of the display component 102 and the base component 104" ('688 Patent, 9:30-34).

Defendants cite no evidence for their attempt to equate "orientation sensor" with only a **single** accelerometer (s*upra* at 35). In this art, the term "orientation sensor" is routinely used to describe a device containing **two or more** accelerometers:

- U.S. 7,555,398, 2:33-37 ("an orientation sensor includes … two three-axis accelerometers"). Ex. 51.

- WO 2012/062509, 1:28 ("an orientation sensor has two or more accelerometers"). Ex. 52.

- U.S. 7,380,722, 4:8-12 ("orientation sensor" made from "two accelerometers" in FIG. 5). Ex. 53.



FIGURE 5

Indeed, the '688 Patent expressly teaches that "elements . . . referred to in the singular may also embrace embodiments including a plurality of these elements" (6:10-13). Ex. 20, ¶ 78. And as noted above, even a single sensor can include multiple accelerometers.

### 4.    Defendants' Sur-Reply Position

LiTL does not dispute that a single accelerometer cannot perform the claimed function and is not corresponding structure under *Asyst*.  Instead, LiTL quotes its expert's conclusory opinion about what a POSITA would glean from the specification.  But an expert cannot rewrite the specification to supply missing disclosure.  *Default Proof Credit Card v. Home Depot USA*, 412 F. 3d 1291, 1302 (Fed. Cir. 2005) (patentee "cannot use the declaration of its expert to rewrite the patent's specification").

Even if LiTL were correct, accelerometers in both the base and display would not constitute corresponding structure because "the disclosure must be of 'adequate' corresponding structure to achieve the claimed function."  *Williamson*, 792 F.3d at 1352 (citation omitted). LiTL's expert opined that accelerometers on two objects can determine the angle of each object relative to gravity (Ex. 20, ¶76), but that falls short of the recited function.  An algorithm must calculate the relative angle of base-to-display using data from those accelerometers, but the specification does not disclose an exemplary algorithm.  For a processor-based means-plus-function limitation, failure to disclose algorithmic structure is fatal.  *Aristocrat v. Int'l Game*

39

*Tech.,* 521 F.3d 1328, 1333 (Fed. Cir. 2008).  Accordingly, any "two accelerometer" embodiments do not qualify as corresponding structure.

Lastly, LiTL incorrectly relies on extrinsic evidence of orientation sensors with multiple accelerometers.  None of it supports LiTL's position.  First, the references do not relate to the relative orientation of two components.  Second, these references provide detailed algorithms for processing the accelerometers' data.  Ex. 51, 8:56-12:4; Ex. 52, 8:24-9:20.  This emphasizes the importance of a suitable algorithm—its omission from the '688 specification is fatal.  *Aristocrat* at 1333.

     **D.**    **Term 5: "An Accelerometer…"**

| | LiTL's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Disputed Terms:**<br>an accelerometer configured to generate orientation information indicative of a current display mode among the plurality of display modes of the portable computer<br><br>an accelerometer configured to generate orientation information indicative of a current mode of operation<br><br>**Relevant Claims:**<br>9,563,229 Claims 1, 18 | one or more accelerometers configured to generate orientation information sufficient to differentiate between all display modes supported by the portable computer ('229 claim 1 and 18) | one or more accelerometers including a single accelerometer configured to generate orientation information sufficient to differentiate between all display modes supported by the portable computer ('229 claims 1, 18) |
| **Disputed Term:**<br>generating, by an accelerometer, orientation information indicative of an orientation of the device<br><br>**Relevant Claims:**<br>9,563,229 Claim 16 | generating by one or more accelerometers orientation information sufficient to differentiate between all display modes supported by the portable computer ('229 claim 16) | generating by a single accelerometer orientation information sufficient to differentiate between all display modes supported by the portable computer.  This construction does not preclude also having additional accelerometers in |

| | | the portable computer ('229 claim 16) |
|---|---|---|
| **Why resolution of the dispute matters** | The dispute concerns whether the terms encompass more than one accelerometer. LiTL expects that resolving the dispute could affect whether Defendants assert certain noninfringement and invalidity defenses. | Adopting Defendants' construction of these terms would be dispositive of infringement for all asserted claims of the '229 patent. |

### 1. Plaintiff's Opening Position

The crux of the parties' dispute is whether to apply the general rule that "an" means "one or more," or whether one of the "extremely limited" exceptions to this rule applies such that the term "an accelerometer" should be narrowly construed to mean "a single accelerometer." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008).

The term "an accelerometer" appears in open-ended claims of the '229 Patent that contain the transitional phrase "comprising." '229 Patent, claims 1, 16, 18. The Federal Circuit has "repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *Convolve v. Compaq Comput.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016). Exceptions to this rule are "extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'" *Id.* (cleaned up). No such exception applies here.

The specification is consistent with this general rule – indeed, it ***expressly defines*** singular elements to encompass a plurality of such elements: "Any references to … elements … herein referred to in the singular may also embrace embodiments including a plurality of these elements." '229 Patent, 6:32-35. Under Federal Circuit law, such a definition "reinforces" the general rule, and "also brings into play the lexicography principle," namely, that "the inventor's lexicography governs." *ABS Glob. v. Cytonome/St*, 84 F.4th 1034, 1041 (Fed. Cir. 2023).

41

The prosecution history likewise confirms the general rule. Because the '229 Patent is a continuation of the '688 Patent, post-grant proceedings involving the '688 Patent are relevant to construing the '229 Patent's claims, as Defendants acknowledge in their intrinsic evidence citations. Ex. 1, p. 13 (Term 5) (Defendants citing '688 Patent reexamination filings). During an *ex parte* reexamination (EPR) of the '688 Patent, LiTL submitted expert testimony from Eric Bear, who explained that the specification not only defines singular elements to include a plurality of such elements, Ex. 20, ¶78, but that it also discloses embodiments that a POSA would have understood as using multiple accelerometers to distinguish frame from easel mode. *Id.*, ¶¶79-80.

Defendants' proposed constructions thus deviate from Federal Circuit law, the specification, and the prosecution history. They are also confusing: While they acknowledge the possibility of "having additional accelerometers in the portable computer" or having "one or more accelerometers," they fail to specify whether those additional accelerometers are used to generate "orientation information," thus potentially creating an *O2 Micro* situation in which the parties need to relitigate the construction's meaning.

If Defendants' proposal is intended to require that one *and only one* accelerometer generate the required "orientation information," it would, according to Defendants' invalidity contentions, render the claimed embodiments non-enabled. Ex. 50, p. 109. But constructions that would "render the claims inoperable" are disfavored. *See Power Integrations v. Fairchild Semiconductor Int'l*, 904 F.3d 965, 972 (Fed. Cir. 2018). This Court has likewise invoked "[t]he canon favoring constructions that preserve claim validity." *Ansell Healthcare Prods.*, 2018 WL 620968, at *3. For this additional reason, Defendants' proposed construction should be rejected.

### 2.    Defendants' Answering Position

Contrary to LiTL's opening brief, the crux of the parties' dispute is not whether there can be more than one accelerometer. The dispute is whether the claims require that there be at least one single accelerometer that can "generate orientation information indicative of a current display mode among the plurality of display modes of the portable computer," as required by Defendants' construction, or whether the claim allows this function to be performed by a combination of two or more accelerometers, as LiTL contends.

The Federal Circuit encountered this precise issue in *Varma*. The court there rejected the same argument LiTL makes here, which is premised on open-ended "comprising" claims and an indefinite article. *See In re Varma*, 816 F.3d 1352 (Fed. Cir. 2016). In *Varma*, the disputed claim phrase recited "*a* statistical analysis *request* corresponding to two or more selected investments." *Id*. at 1362. The Federal Circuit rejected a construction where the claim limitation of "*a* request" (singular) associated with the claimed two or more investments can be met by two separate requests (plural). The Federal Circuit explained:

> Although the transitional term 'comprising' indicates that the claim is open-ended, the term does not render each limitation or phrase within the claim open-ended. … Thus, here, a claim-covered system may receive more than one request, but it must in particular be adapted to receive 'a request' that itself corresponds to two or more selected investments.

*Id*. at 1362. The court explained that "the question is not whether there can be more than one request in a claim-covered system: there can. Rather, the question is whether 'a' can serve to negate what is required by the language following 'a': a 'request' (a singular term) that 'correspond[s]' to 'two or more selected investments.' It cannot." *Id*. at 1363 (analogizing: "For a dog owner to have 'a dog that rolls over and fetches sticks,' it does not suffice that he have two

dogs, each able to perform just one of the tasks."). *See also Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1317 (Fed. Cir. 2023); *Harari v. Lee*, 656 F.3d 1331, 1340-41 (Fed. Cir. 2011).

Following *Varma*, Defendants' construction allows a device to have more than one accelerometer. But to meet the entire "an accelerometer…" limitation, one accelerometer ("a dog") must be able generate the required information to differentiate between all display modes ("that rolls over and fetches sticks"). LiTL's proposal is wrong because it would permit a device with two accelerometers ("two dogs") that each generates only part of the required information ("each able to perform just one of the tasks"). LiTL's citation to *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (*supra* at 41) is inapposite because *Baldwin* did not involve a singular element followed by multiple functional requirements.

LiTL's reliance on the specification's statement that references to single elements may also embrace embodiments including a plurality of elements (*supra* at 41-42) fails for the reasons discussed above. That specification statement signifies nothing more than the general rule that "a" or "an" can mean one or more, and that the claim is open-ended, but does not negate the requirement that a single accelerometer must itself perform the function recited in the claims for the reasons explained in *Varma*.

LiTL wrongly argues that Defendants' construction is "confusing." *Supra* at 42. Defendants' construction correctly requires that there be a single accelerometer that generates the orientation information while allowing for additional accelerometers without specifying what those additional accelerometers do. This is consistent with *Varma*: "no matter how many requests there may be, no matter the variety of the requests the system may receive, the system must be adapted to receive a request that itself corresponds to at least two investments." 816 F.3d at 1363.

Finally, LiTL argues that its proposal would preserve enablement. *Supra* at 42. This argument fails because the claim scope under LiTL's construction encompasses a single accelerometer that generates all the required information—exactly as Defendants propose. Therefore, if the claim is not enabled under Defendants' construction, it also is not enabled under LiTL's.

### 3.    Plaintiff's Reply Position

The parties dispute whether the phrase "an accelerometer…" can include more than one accelerometer that is configured to generate the claimed orientation information. Federal Circuit caselaw – undisputed by Defendants – establishes that "a" or "an" can as a general rule encompass more than one of the identified devices. Defendants seek to apply an exception set forth in *Varma*, but that exception does not apply here for two reasons.

*First*, LiTL's specification "expressly defines singular elements to encompass a plurality of such elements" (*supra* at 41) whereas the specification in *Varma* did not. Defendants assert (without citing authority) that the '229 Patent's definition is not significant. *Supra* 44. To the contrary, *ABS Global* held that such a definition "reinforces … the 'one or more' general rule concerning 'a,'" and "also brings into play the lexicography principle." 84 F.4th at 1041. Defendants' failure to address *ABS Global* (quoted at *supra* at 41) is fatal to their argument.

*Second*, *Varma* involved "a singular element followed by multiple functional requirements" (*supra* at 44) whereas the '229 claims recite a single functional requirement for "an accelerometer" – namely, "configured to generate orientation information indicative of a current display mode." Indeed, Defendants uniformly refer to "this function" (*supra* at 43) and "the function" (*supra* at 44) rather than to plural "functions," and thus acknowledge that the '229 claims recite only one function for "an accelerometer." By contrast, *Varma* and *Harari* (*supra* at 44) deviated from the *Baldwin* rule (*i.e.*, that "a" generally means "one or more") because the

claims "expressly distinguishe[d] between the singular and plural." *Harari*, 656 F.3d at 1341 (contrasting "a" with "a number of"); *In re Varma*, 816 F.3d at 1363 (contrasting "a" with "two or more"). Here, they do not.

Separately, enablement considerations support LiTL's construction. Defendants do not dispute that "constructions that would 'render the claims inoperable' are disfavored." *Supra* at 42. Instead, Defendants suggest the claim would be non-enabled under LiTL's construction if it is non-enabled under Defendants'. *Supra* at 45. Not true. Under LiTL's construction, a single accelerometer is one inoperative embodiment among many operative embodiments (i.e., those with two, three, four or more accelerometers). LiTL's expert testified that a POSITA would have known a single accelerometer cannot detect the base-to-display angle (Ex. 20, ¶ 86), which testimony Defendants rely upon (*supra* at 36). A single inoperative embodiment under LiTL's construction does not render the claims non-enabled because "the necessary information to limit the claims to operative embodiments is known to [POSITA]." *Crown Operations Int'l v. Solutia*, 289 F.3d 1367, 1380 (Fed. Cir. 2002). By contrast, Defendants do not dispute their single-accelerometer construction would render the claims non-enabled. *Supra* at 45.

### 4.    Defendants' Sur-Reply Position

*ABS Global* does not help LiTL because both parties' constructions allow "an accelerometer" to mean one or more accelerometers. LiTL does not dispute this. *ABS Global* does not address the dispute here, which is whether a single accelerometer (of the one or more accelerometers) must perform the additional limitations that follow "an accelerometer."

LiTL's attempts to distinguish *Varma* fail. The claim in *Varma* recites "**a request** that corresponds to two or more selected investments." The claims here follow the same structure: "**an accelerometer** configured to generate orientation information...." LiTL manufactures differences that do not exist under this analysis. And, consistent with LiTL's misapplication of

46

this established principle regarding indefinite articles, LiTL is wrong in claiming *Varma* deviated from the *Baldwin* rule. This is because *Varma* allows for there to be (as applied here) more than one accelerometer, just as Defendants' construction allows.

LiTL urges a construction that preserves validity. However, "the canon that claims should be construed to preserve their validity, if possible, applies only if the scope of the claims is ambiguous." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F. 3d 898, 914 (Fed. Cir. 2004). Here, no party contends the claim language to be ambiguous. Moreover, on the specific issue of enablement, *Liebel* adopted a construction notwithstanding express concerns raised regarding non-enablement under such a construction.[7] *Id.* at 911.

### E.    Term 4: "Display Orientation Module"

| | LiTL's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Disputed Terms:**<br><br>a display orientation module configured to automatically orient content displayed on the display component responsive to at least a transition between the laptop mode and the easel mode, wherein the display orientation module is further configured to orient the content displayed between a first display orientation and a second display orientation, the first and second display orientations being 180 degrees relative to each | No construction necessary.<br><br>In the alternative:<br>The plain and ordinary meaning of "display orientation module" is "a combination of hardware and software that orients content on a display"<br><br>Not subject to 35 U.S.C. § 112 ¶ 6.<br><br>In the alternative:<br>If the term is subject to § 112 ¶ 6, LiTL proposes the following construction:<br><br>**Functions**: LiTL agrees with Defendants' proposed functions. | Subject to 35 U.S.C. § 112 ¶ 6.<br><br>**Function**: (i) automatically orient content displayed on the display component responsive to at least a transition between the laptop mode and the easel mode; (ii) orient the content displayed between a first display orientation and a second display orientation, the first and second display orientations being 180 degrees relative to each other (claim 11)<br><br>**Function**: (i) orients the content displayed on the single display screen responsive to the physical orientation detected by the orientation sensor between at least a first content display |

---

[7] Indeed, the claims were found non-enabled under this construction on remand. *Liebel-Flarsheim*, 481 F.3d at 1378-79 (invalidity affirmed on subsequent appeal).

| | | |
|---|---|---|
| other ('688 Claims 11)<br><br>a display orientation module which orients the content displayed on the single display screen responsive to<br>the physical orientation detected by the orientation sensor between at least a first content display orientation and a second content display orientation, the second content display orientation being 180 degrees relative to the first content display orientation; wherein the display orientation module is further configured to detect a change between a laptop mode, an easel mode, and a frame mode based on the detected physical orientation of the single display unit<br>relative to the base unit ('688 Claims 19) | **Structure**: hardware and/or software (e.g., central processing unit, memory, sensors, computer operating system, dedicated logic circuitry, and other components of the portable computer) programmed to orient the displayed content "right-way-up" in the display modes described in the '688 patent at 2:38-49; 3:19-25; 4:40-50; 5:13-15; 5:35-40; 5:63-6:23; 6:38-42; 8:7-61; 9:19-45; 13:64-14:13; 16:1-50; 16:63-17:7; Figs. 1, 2, 4, 5, 17, 26, 27 and its equivalents | orientation and a second content display orientation, the second content display orientation being 180 degrees relative to the first content display orientation; (ii) detect a change between a laptop mode, an easel mode, and a frame mode based on the detected physical orientation of the single display unit relative to the base unit (claim 19)<br><br>**Structure**: None disclosed, claims indefinite under § 112 ¶ 2. |
| **Disputed Term:**<br>display orientation module that displays content on the display screen in one of a plurality of content orientations relative to the longitudinal axis ('229 Claims 3) | No construction necessary.<br><br>In the alternative:<br>The plain and ordinary meaning of "display orientation module" is "a combination of hardware and software that orients content on a display"<br><br>Not subject to 35 U.S.C. § 112 ¶ 6.<br><br>In the alternative:<br>If the term is subject to § 112 ¶ | Subject to 35 U.S.C. § 112 ¶6.<br><br>**Function**: displaying content on the display screen in one of a plurality of content orientations relative to the longitudinal axis<br><br>**Structure**: None disclosed, claims indefinite under § 112 ¶ 2. |

| | | |
|---|---|---|
| | 6, LiTL proposes the following construction:<br><br>**Function**: LiTL agrees with Defendants' proposed function<br><br>**Structure**: hardware and/or software (e.g., central processing unit, memory, sensors, computer operating system, dedicated logic circuitry, and other components of the portable computer) programmed to orient the displayed content "right-way-up" in the display modes described in the '229 patent at 2:54-65; 3:35-41; 4:57-67; 5:33-35; 5:55-60; 6:18-47; 6:63-67; 8:31-9:21; 9:46-10:7; 14:37-53; 16:44-17:28; 17:41-52; Figs. 1, 2, 4, 5, 17, 26, 27 and its equivalents | |
| **Why resolution of the dispute matters** | If the Court agrees that this is not a means-plus-function term, no construction is needed and there is no further dispute that needs to be resolved. There are three disputes: (1) whether Defendants can overcome the presumption that the claims are not subject to 35 U.S.C. § 112 ¶ 6; (2) if Defendants overcome the presumption, determining the scope of the corresponding structure and its equivalents; and (3) determining whether Defendants can establish by clear and convincing evidence that the structure is insufficient such that the claims are indefinite. Resolving these three disputes could affect whether the claims are invalid for indefiniteness. | Adopting Defendants' constructions of these terms would result in invalidity of asserted claims 11 and 19 of the '688 patent and claim 3 of the '229 patent. |

### 1.    Plaintiff's Opening Position

The term "display orientation module" needs no construction. It uses ordinary words that can be understood by jurors and explained and applied by technical experts.

Should the Court choose to construe the term, its plain and ordinary meaning is "a combination of hardware and software that orients content on a display." This meaning follows from the specifications' description of the display orientation being rotated such that the information remains right-way-up as the computer transitions from one mode to another. '688 Patent, 8:7-34, 13:64-14:13, 16:28-50; '229 Patent, 8:31-59, 14:37-53, 17:5-28.

Defendants contend that this term is subject to §112, ¶6. But the absence of "means" from the claim language creates a presumption that §112, ¶6 does not apply. *Williamson*, 792 F.3d at 1348. Because overcoming this presumption is Defendants' burden, LiTL's reply brief will respond to Defendants' arguments regarding §112, ¶6.

### 2.    Defendants' Answering Position

Asserted claims 11 and 19 of the '688 Patent and 3 of the '229 Patent recite "a display orientation module."  This is a means-plus-function term that must be construed pursuant to 35 U.S.C. § 112 ¶ 6.  Because the patents do not disclose structure for the claimed function, the term is indefinite.

The presumption that § 112 ¶ 6 does not apply to "display orientation module" is rebutted because the claim term uses a nonce word, "module," without sufficient structure. *Williamson*, 792 F.3d at 1348-49 (en banc). "'Module' is a well-known nonce word that can operate as a substitute for 'means.'" *Id.* at 1350.  "Module" as part of "display orientation module" does not provide any indication of structure.  Nor does the prefix "display orientation" impart structure.  It only describes the function of the module:  to orient a display. *Id.* at 1351; *see also Rain Computing v. Samsung Elecs. Am.*, 989 F.3d 1002, 1006 (Fed. Cir. 2012) ("user identification

module" does not disclose structure).  Moreover, "display orientation module" is not a commonly used term of art with a specific meaning connoting a structure or class of structures. Ex. 48, ¶36.  The specifications of the '688 and '229 Patents do not indicate otherwise. Consequently, the term recites function without reciting sufficient structure for performing that function.  *Id.*, ¶37.  This is enough to rebut the presumption that the term should not receive means-plus-function treatment.  *See TQ Delta, LLC v. 2Wire, Inc.*, No. 13-1836-RGA, 2018 WL 626472, at *9-*10 (D. Del Jan. 30, 2018) (finding "message determination module" subject to Section 112 ¶ 6).

Identifying the function is the first step in construing a means-plus-function limitation. Here, the parties agree on the functions performed by the "display orientation module": orienting content on the display component of a portable computer in response to the transition from one display mode to another display mode.  Ex. 1, p. 8.

The second step is to determine whether the specification discloses any structure which corresponds to the claimed function.  Where the function is performed by a general-purpose computer, the term is indefinite if the specification does not disclose an algorithm that the computer performs to accomplish that function.  *Rain Computing*, 989 F.3d at 1007; *Aristocrat,* 521 F.3d at 1333; *Williamson*, 792 F.3d at 1352.  The specifications of the '688 and '229 Patents disclose no such algorithm for performing the claimed functions of the "display orientation module." Ex. 48, ¶¶39-40.  Therefore, these claims of the '688 and '229 Patents are indefinite.

LiTL's proposed structure for the "display orientation module" acknowledges the need for "software" and "programming": "hardware and/or software… programmed to orient the displayed content 'right-way-up' in the display modes."  Ex. 1, p. 8.  However, LiTL does not

identify any algorithm performed by the software, and LiTL's list of standard computer components does not demonstrate how any of the listed components correlate to the "display orientation module" or how they create structure for the function of that module.  Ex. 48, ¶¶41-43.  The "display orientation module" term is therefore indefinite.

### 3.    Plaintiff's Reply Position

The parties dispute whether the phrase "display orientation module" is a means-plus-function ("MPF") claim and, if so, whether the specification discloses an algorithm that performs the claimed function. The term is presumptively not a MPF term because it does not recite the word "means." Defendants have not overcome the presumption because the claims themselves disclose sufficient structure.

Even if Defendants were able to overcome the presumption, the term is not indefinite because the specification discloses an if-then algorithm – namely, *if* a transition between display modes is detected, *then* the displayed content is inverted.

#### a.    Defendants Fail to Overcome the Presumption.

The term "display orientation module" needs no construction; the term's plain meaning is "a combination of hardware and software that orients content on a display." Ex. 63, ¶ 30.

Seeking to overcome the presumption that this term is not MPF, Defendants argue that the specification does not disclose sufficient structure for the claimed function. *Supra* at 50-51. But Defendants ignore language that "provide[s] algorithmic structure for performing that function." *M2M Sols. LLC v. Sierra Wireless Am., Inc.*, No. 12-30-RGA, 2015 WL 5826816, at *5 (D. Del. Oct. 2, 2015).

A POSITA would have understood '688 claim 11 to comprise an if-then algorithm: *if* the orientation sensor detects a change from laptop mode to easel mode (or vice versa), *then* invert the displayed content so that the displayed content appears right-way-up. Ex. 63, ¶¶ 35-37. The

other two claims at issue (i.e., '688 claim 19 and '229 claim 3) comprise the same type of if-then algorithm. *Id.*, ¶¶ 38-41. Because the claim limitations themselves recite "a sufficient description of [the display orientation module's] operation, the presumption against means-plus-function claiming remains intact." *M2M*, 2015 WL 5826816, at *3.

Contrary to Dr. Wolfe's assertion (Ex. 48, ¶ 40), a POSITA would have understood the specification to disclose the above-described if-then algorithm when it states:

> when the portable computer 100 is configured into the easel mode, the visual display on the display screen 110 is automatically rotated 180 degrees such that the information appears "right-way-up," even though the display screen is upside-down compared to when the portable computer is in the laptop mode.

'688 Patent, 14:1-6; Ex. 63, ¶¶ 48-50. The algorithm also applies "vice versa," i.e., so that information appears right-way-up when transitioning from easel to laptop. *Id.*, 13:64-14:1.

Other intrinsic evidence confirms that "display orientation module" is not a MPF term. During original prosecution of '688 claims 3-5 and 19 (then 3-5 and 21), the examiner did not interpret "display orientation module" as MPF. Ex. 10, LITL00245180-184; Ex. 63, ¶¶ 51-54. Indeed, in IPR proceedings (Ex. 54, ¶¶ 74-92), Dr. Wolfe followed the examiner's example by not interpreting the term as MPF (*id.*, ¶¶ 160-182).

> **b.** Even If "Display Orientation Module" Were Subject to §112 ¶6, It Is Not Indefinite.

Even if the term "display orientation module" were subject to §112 ¶6, it is not indefinite because it was a term of art connoting the if-then inversion algorithm detailed above, as confirmed by a Dell patent filed in 2006. Dell's own patent is directed to the use of "a **display orientation module**" that "automatically adjusts the orientation of an image." Ex. 55, Abstract. As explained in Walker Decl., ¶¶ 69-75, Dell's patent discloses an if-then inversion algorithm using the very same term in dispute here. *See StrikeForce Techs. Inc. v. PhoneFactor Inc.*, No.

13-490-RGA-MPT, 2015 WL 5708577, at *3 (D. Del. Sept. 29, 2015) (finding term not indefinite where expert identified patent that specifically described the disputed term).

Other intrinsic evidence further confirms there is sufficient corresponding structure. In a 2021 IPR, Lenovo's expert identified the same portion of the specification noted above (i.e., 13:64-14:6) as disclosing "[t]he corresponding structure for the above-discussed display orientation modules." Ex. 15, ¶ 124; Ex. 63, ¶¶ 62-68. Dr. Wolfe overlooked this intrinsic evidence. Ex. 48, ¶ 43.

### 4. Defendants' Sur-Reply Position

LiTL fails to overcome Dr. Wolfe's showing that the claim terms at issue do not connote sufficiently definite structure—the algorithm LiTL wrongly alleges to be recited in the claims is not self-executing. *Williamson* at 1349. The claims are therefore subject to § 112(6).

LiTL is similarly wrong in contending the patent discloses an algorithm, i.e. "a step-by-step procedure for accomplishing a given result." *Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*, 841 F.3d 1334, 1342-43 (Fed. Cir. 2016). According to LiTL, disclosure stating "when the portable computer 100 is configured into the easel mode, the visual display on the display screen 110 is automatically rotated 180 degrees such that the information appears 'right-way-up'" constitutes a corresponding "if-then" algorithm. This language (and similarly the language in the claims) does not instruct how to rotate the display by 180° or how to determine the correct orientation for laptop or easel mode. *WSOU Invs. LLC v. Google LLC*, No. 2022-1064, 2023 WL 6531525, at *4 (Fed. Cir. 2023) ("the functional descriptions of the databases in the specification does not describe how the management of collaborative applications is achieved"). Nor does the specification indicate <u>which</u> component performs inversion, the unclarity of which is emphasized by the LiTL-cited Dell patent. *Cochlear*, 841

F.3d at 1343-44; Ex. 55, 4:37-40 (*graphics system 50*, not display orientation module, orients the image).

None of the "intrinsic evidence" demonstrates that the patents contain the necessary algorithm to provide structure. Finally, LiTL's claim that "display orientation module" is a "term of art,"[8] and thus not indefinite, because an unrelated Dell patent involving different technology that does not perform the recited function used the term is specious.

### F.    Term 6: "Disable the Keyboard…"

|  | LiTL's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Disputed Terms:**<br>disable the keyboard when the portable computer is in the frame mode ('229 claim 1)<br><br>disable the keyboard when the portable computer is in the sideways v configuration ('229 claim 16)<br><br>disable the keyboard in response to detecting the portable computer is in the frame mode ('229 claim 18)<br><br>**Relevant Claims:**<br>9,563,229 Claims 1, 16, 18 | No construction necessary.<br><br>In the alternative:<br>The plain and ordinary meaning of these phrases is the phrase, as written, without Defendants' addition of the term "only". | disable the keyboard only when the portable computer is in the frame mode |
| **Why resolution of the dispute matters** | The dispute concerns whether the terms include the word "only." LiTL expects that resolving the dispute could affect whether Defendants assert certain noninfringement and invalidity defenses. | Adopting Defendants' construction of this term would be dispositive of infringement for all asserted claims of the '229 patent. |

---

[8] *StrikeForce* does not support LiTL. It holds plaintiff's expert opinion that "control module" is a term of art to be erroneous.

### 1.    Plaintiff's Opening Position

This term need not be construed. It consists of readily-understandable English words like "disable" and "keyboard."

Defendants seek to construe the term in order to import a limitation – the word "only" – into the claims. They appear to contend that prosecution disclaimer requires disabling the keyboard *only* in frame mode and ***not*** in other display modes.

Defendants bear a heavy burden to establish such disclaimer by "clear and unmistakable" evidence. *Omega Eng'g, Inc.,* 334 F.3d at 1326. They have no such evidence.

During the '229 prosecution, LiTL added dependent claims 20 and 21 (which issued as claims 18 and 19), that recited:

> 20.    (new) The portable computer of claim 3, wherein the display orientation module further disables the keyboard in response to the mode sensor detecting the portable computer is in the frame mode.
>
> 21.    (new) The portable computer of claim 3, wherein the display orientation module further disables the keyboard in response to the mode sensor detecting an orientation of the portable computer.

Ex. 57, LITL00246161.

The examiner rejected claims 20 and 21 for lack of written description. Ex. 57, LITL00246197-198. He acknowledged that paragraph 85 of the '229 specification ('229 Patent, 16:36-61) mentions disabling the keyboard "to prevent the portable computer from responding to pressed keys" "when the portable computer is in the frame mode," *id.*, but argued that does not specify that it is done "in response to ***a mode sensor***" as the claims required. *Id.*

In response, LiTL removed the phrase "mode sensor" and re-wrote claim 20 in independent form, portions of which are depicted below:

56

> 20.    (Currently Amended)  ~~The portable computer of claim 3,~~ A portable computer configurable between a plurality of display modes including at least a laptop mode and a frame mode, the portable computer comprising:

> wherein the portable computer is configured to detect a transition to the frame mode, automatically determine a display orientation of content, and disable ~~wherein the display orientation module further disables~~ the keyboard in response to ~~the mode sensor~~ detecting the portable computer is in the frame mode.

Ex. 57, LITL00246238-239.

LiTL argued that ¶85 provides written description support for that claim, noting that a POSITA would understand that the sentence about disabling the keyboard "in the frame mode" ('229 Patent, 16:57-61) did ***not*** apply to laptop mode, *id.*, LITL00246242. As LiTL explained: "Preventing the user from using the keyboard in the laptop mode is not reasonable." *Id.*, LITL00246242. While disabling the keyboard in frame mode avoids unintentional activation (clicks) of keys, disabling it in laptop mode would accomplish no such goal – indeed, it "would needlessly make the system more difficult to operate." *Id.* Thus, LiTL explained, a POSITA "would recognize the problem described (unintentional[] activation of keys) would only occur in the frame mode" and that ¶85 was not addressing disabling the keyboard "in other modes." *Id.*

Defendants apparently intend to argue that by using the phrase "other modes," LiTL disclaimed deactivating the keyboard in ***any and all*** other conceivable modes. Such a theory would take the statement wildly out of context. Then-pending claims 20 and 21 recited only three modes: "closed," "laptop," and "frame." In that context, LiTL's reference to "other modes" besides "frame" was plainly a reference to the only "other modes" recited in the claim at that time, namely "closed" and "laptop." It was not a reference to "easel mode," ***which was not added to the claims until the following year***. Ex. 57, LITL00246387.

LiTL's statements thus do not give rise to the prosecution disclaimer on which Defendants appear to rely for their proposed construction.

Defendants' contrary argument fails for four reasons. ***First***, LiTL's statement that ¶85 would not be interpreted "as teaching disabling the keyboard in other modes" (*id.*, LITL00246242) was not a disclaimer (let alone a "clear and unmistakable" disclaimer) of all ***possible*** display modes other than frame mode; rather, it referred only to the "other modes" (closed and laptop) ***that were at issue*** in claims 20 and 21 at the time. LiTL was simply pointing out that the problem of unintentional activation of keys, which (in frame mode) could be solved by disabling the keyboard, was not a problem in the two other modes that were the subject of that discussion. (It is not a problem in laptop mode because the keyboard is actually used in that mode; and it is not a problem in closed mode because keys cannot be pressed when the laptop is closed.)

When read, as it must be, in the context of the actual issue that LiTL and the examiner were then debating, LiTL's statement about "other modes" was not a disclaimer of disabling the keyboard in any and all ***possible*** modes that might later arise. Rather it referred only to other modes that were encompassed ***at that time*** by the claim language. *See Vectura Ltd. v. GlaxoSmithKline LLC*, No. 16-638-RGA, 2018 WL 4700222, at *4 (D. Del. Oct. 1, 2018) (finding no prosecution disclaimer when patentee's statements were properly considered in context of particular rejection to which patentee was responding), *aff'd*, 981 F.3d 1030 (Fed. Cir. 2020).

On analogous facts, this Court has refused to read in the same negative limitation ("only") where the allegedly disclaimed subject matter was not the focus of the patentee's back-and-forth with the examiner. During prosecution in *Vectura*, "the patentee stated, '[C]o-milling

of active and additive material ... is the <u>only</u> method that can produce the claimed composite particles.'" 2018 WL 4700222, at *4 (emphasis original). Defendant argued that patentee had thus disclaimed composite particles made by other methods. But the Court held that the statement did not constitute disclaimer because the patentee's statement was made to address a different issue – namely, that the claims require "particles" rather than the prior-art liquid-phase materials. *Id*. LiTL's statement similarly was made to address the distinction between frame and laptop, not all other possible modes.

LiTL's statement, moreover, was not made to overcome a rejection based on a lack of support for disabling keyboards in any or all modes other than frame. LiTL was addressing the examiner's allegation that there was insufficient support for how the computer detects **frame** mode specifically. Accordingly, LiTL was highlighting the distinction between laptop mode (where the keyboard is enabled) and frame mode (where it is disabled) to emphasize that there was written description support for disabling the keyboard in response to "detect[ing] a transition to the frame mode," as claim 20 requires.

Nor was LiTL's statement made to overcome a prior art rejection, which is the paradigmatic prosecution disclaimer fact pattern. *See SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1307 (Fed. Cir. 2003) (reversing finding of prosecution disclaimer where patentee's statements were not made to overcome prior art); *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 798-99 (Fed. Cir. 2019) (vacating noninfringement finding: "describing a particular claim term to overcome an indefiniteness or written description rejection is not the same as clearly disavowing claim scope"); *Vetstem Biopharma, Inc. v. California Stem Cell Treatment Ctr., Inc.*, No. 19-004728-AB-FFM, 2020 WL 5648353, at *4 (C.D. Cal. Sept. 9, 2020)

(amendment to overcome written description rejection was "insufficient to satisfy the high burden required to show disclaimer").

*Second*, the prosecution history following LiTL's statements confirms there was no prosecution disclaimer. The examiner certainly did not interpret the disputed phrase to mean what Defendants propose – indeed, the examiner later applied a prior art reference against the "disable the keyboard" limitation that, on the examiner's theory, discloses disabling the keyboard in more than just frame mode. After LiTL's statement, LiTL submitted an IDS identifying a new reference, U.S. 6,154,359 to Kamikakai (Ex. 12, LITL00246320). The examiner issued obviousness rejections finding that Kamikakai discloses the "disable the keyboard" limitations. *Id.*, LITL00246352-354 (Claim 1), LITL00246359-361 (Claim 17), LITL00246361-363 (Claim 20). The examiner cited FIG. 8 of Kamikakai as disclosing the frame mode. *Id.*, LITL00246354.

But Kamikakai's disclosure of a portable computer "with a mechanism for disabling the keyboard …," Ex. 43, DPA_000014 (6:51-57), encompasses both a display with an "upright position ($\gamma=90°$) or a horizontal position ($\gamma=0°$) to suit the user's needs." *Id.*, DPA_000015 (7:4-8). Thus, if Kamikakai disclosed a disabled keyboard, it would on the examiner's theory apply as well to "tablet mode" as to "frame mode." In short, the examiner did not regard LiTL as having disclaimed disabling the keyboard in *all* display modes other than frame.

*Defendants' own arguments* in the '229 Patent IPR proceedings likewise reflect the position that LiTL had not disclaimed all display modes other than frame mode in which the keyboard was disabled. Defendants asserted that prior art Lane discloses the "disable the keyboard" limitation. Ex. 44, pp. 43-44. Defendants submitted expert testimony that Lane discloses disabling the keyboard (i.e. rendering certain keys "inoperable") in a "frame mode." Ex. 56, ¶211. But Defendants' expert went on to assert that "Lane also teaches and illustrates that

the keyboard is not readily accessible to the user in both *easel mode* and *frame mode*." *Id.*, ¶209 (emphasis in original). By seeking to read a prior-art reference onto disabling a keyboard in multiple modes, Defendants implicitly acknowledged such other modes had not been disclaimed.

  **Third**, even if the Court were to find that LiTL's prosecution statements **could** be read as Defendants suggest, LiTL's interpretation is not unreasonable. And as this Court has held, when a prosecution history "is 'amenable to multiple reasonable interpretations,' [it] is, therefore, not sufficient to show disclaimer." *Baxalta Inc. v. Bayer HealthCare LLC*, No. 17-1316-RGA, 2019 WL 3290987, at *4 (D. Del. July 22, 2019) (*quoting Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016)); *see also SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005) ("There is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation.").

  **Fourth**, each of the '229 Patent's asserted independent claims 1, 16, and 18 uses the transition term "comprising," which "creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001). Defendants' proposed construction contravenes this presumption by excluding additional, unrecited embodiments (i.e., computers that disable the keyboard in a mode other than frame). This Court has similarly relied on the fact that a "limitation appears in a 'comprising' claim" when finding no disclaimer and refusing to read in a negative limitation sought by defendant. *Vectura*, 2018 WL 4700222, at *4.

## 2. Defendants' Answering Position

  During the prosecution of the '229 Patent, LiTL told the examiner that in the claimed invention the keyboard is disabled *only* when the computer is placed in frame mode:

> [A] person of ordinary skill in the art would understand the specification's reference to 'when the portable computer is in the frame mode' is intended *to limit* the software and/or hardware protection of *disabling the keyboard to when the portable computer is in the frame mode.*

Ex. 57, LITL00246242.

> One of skill in the art would recognize the problem described (unintentionally activation [sic] of keys) would *only* occur in the frame mode and the solution would be implement 'when the portable computer is in the frame mode.*' It would not be reasonable for the person of skill in the art to interpret paragraph 85 as teaching disabling the keyboard in other modes*.

*Id.*

> [O]ne skilled in the art would recognize that *a portable computer configured to disable the keyboard 'when in the frame mode,' is a function provided in the frame mode.*

*Id.*, LITL00246243.

LiTL's attempt to avoid the import of these statements fails for several reasons. *First*, the disputed claim term was added by amendment to every claim of the '229 Patent, not just draft claims 18 and 19 (issued claims 20 and 21) as LiTL suggests. *Supra* at 29-30. Contrary to LiTL's argument, the disputed claim term was added in response to a prior art rejection:

- On May 18, 2015, the examiner rejected draft claims 1 and 17 (issued claims 1 and 16), finding that a prior art combination (Misawa and Takagi references) disclosed a frame mode. Ex. 57, LITL00246198-99. At the same time, draft claims 20 and 21 were rejected under § 112. *Id.*, LITL00246196-98.

- On July 20, 2015, LiTL amended the claims. Draft claims 1 and 17 were *amended for the first time to include disabling the keyboard in frame mode*.[9] *Id.*, LITL00246234 (Claim 1), LITL00246237-38 (Claim 17). Draft claims 20 and 21

---

[9] Draft claim 17 (issued claim 16) refers to frame mode as a "sideways v configuration."

were amended to remove any mention of a mode sensor but retained the key

concept that the keyboard was disabled in frame mode.  *Id.*, LITL00246238-39

(Claims 20 and 21).

In the July 20, 2015 remarks, LiTL argued that disabling the keyboard in frame mode

distinguished claims 1, 17, 20 and 21 from the prior art.  "*[N]one of the references disclose*

'wherein the portable computer is configured to... disable the keyboard in response to detecting

the portable computer is in the frame mode....'"  *Id.*, LITL00246243 (distinguishing claims 20

and 21 on this basis); *id.*, LITL00246244-45 (distinguishing claims 1 and 17).  The examiner

agreed.  The notice of allowance states that the prior art references do not disclose disabling the

keyboard in frame mode.  *Id.*, LITL00246261-62.  Thus, LiTL's argument that the statements

were only made in response to § 112 rejections and limited to draft claims 20 and 21 is false.

*Second*, LiTL is wrong that its July 20, 2015 statement about "other modes" excluded

easel mode.  Contrary to LiTL's assertion, *easel mode was already recited in draft claim 12*,

which depended from draft claim 1, on July 20, 2015.  *Id.*, LITL00246236.

Further, when LiTL added "easel mode" back into the other claims, it amended them to

require "detecting a transition to at least the easel mode," but *chose to leave the keyboard*

*disabling clause as-is*.  *See, e.g., id.*, LITL00246388 (claim 1); *see also id.*, LITL00246393

(claim 20).  And the specification expressly states that the keyboard may be used in easel mode.

Ex. 4 ('229 Patent), 8:15-18, 13:55-65, 14:26-29, Fig. 17, item 168.  Thus, LiTL intended the

keyboard to be disabled *only* in the frame mode.

LiTL's reliance on *Vectura Ltd. v. GlaxoSmithKline LLC* is misplaced.  *Vectura* teaches

that a court should analyze the entirety of the statements made during the prosecution to

63

understand the reasons a particular amendment was made. 2018 WL 4700222, at *4.[10] Here, when the entirety of LiTL's statements is examined, it is clear that the reason behind the July 20, 2015 amendments was to introduce limitations about disabling the keyboard in only the frame mode to attain patentability.[11]

LiTL's argument that the amendments were only made to distinguish the frame mode from laptop mode is incorrect. The claim amendments were intended "*to limit* the software and/or hardware protection of disabling the keyboard to when the portable computer is in the frame mode." Ex. 57, LITL00246242. *See Helsinn Healthcare S.A. v. Dr. Reddy's Lab'ys, Ltd*., No. CIV.A. 11-3962 MLC, 2015 WL 1817109, at *8 (D.N.J. Apr. 22, 2015) (disclaimer found where applicant stated "the pending claims are limited to intravenous formulations"). LiTL declared it would "not be reasonable for the person of ordinary skill in the art to interpret paragraph 85 as teaching disabling the keyboard in other *modes*" because "[s]uch an interpretation would needlessly make the system more difficult to operate." Ex. 57, LITL00246242. LiTL raised the laptop mode as an "example" of when disabling the keyboard would be disadvantageous. *Id*.[12]

---

[10] LiTL's reliance on *Cont'l Circuits v. Intel Corp.* and *Vetstem Biopharma, Inc. v. California Stem Cell Treatment Center, Inc.* is inapposite. In *Continental Circuits*, the alleged disclaimers used to overcome a § 112 rejection appeared in an expert declaration, and the Federal Circuit concluded the declaration "merely explain[s] one technique for forming teeth and do not amount to clear disavowal of any claim scope." 915 F.3d at 799. In *Vetstem*, the Court concluded that defendant's proposed construction injected a new limitation into the claim rather than identify any disavowal. 2020 WL 5648353, at *4. Here, the patent holder unequivocally stated that the keyboard was disabled *only* in frame mode because the problem being solved *only* existed in frame mode.

[11] To the extent LiTL suggests there can be no disclaimer based on an amendment in response to a § 112 rejection, that is incorrect. *See Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1092 (Fed. Cir. 2013).

[12] Because the prosecution history demonstrates LiTL's interpretation is unreasonable, its argument that its construction is equally reasonable and should be adopted under *Baxalta v.*

LiTL's argument about how the examiner applied a prior art Kamikakai reference or what the Defendants argued in their IPR petition on the '229 Patent is of no moment because i) Defendants' arguments have no bearing on LiTL's disclaimer, and ii) the file history shows that the examiner found that Kamikakai disclosed the keyboard disabled only in frame mode to avoid "inadvertent key inputs." *Id*., LITL00246354. Further, "[t]he fact that an examiner placed no reliance on an applicant's statement distinguishing prior art does not mean that the statement is inconsequential for purposes of claim construction." *Springs Window Fashions LP*, 323 F.3d at 995 (citation omitted).

Finally, LiTL's argument that the '229 Patent claims are open-ended is irrelevant because an open-ended claim cannot vitiate a clear and unmistakable disclaimer. *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007).

### 3.    Plaintiff's Reply Position

Defendants do not dispute that their proposed construction – which seeks to limit the '229 claims to require disabling the keyboard "only" in frame mode – requires proving that a "clear and unmistakable" disclaimer occurred. *Supra* at 56. Nor do they dispute that there is no disclaimer where the prosecution history is "amenable to multiple reasonable interpretations." *Compare supra* at 61 *with supra* at 64 n.12 (citing *Baxalta*). Defendants fail to show LiTL's interpretation of the prosecution history is unreasonable.

a.    LiTL's Statement Was Not Made to Overcome a Prior Art Rejection.

The parties focus on statements LiTL made in an office action response dated July 20, 2015. Ex. 57, LITL00246242-243. Defendants contend that "LiTL's argument that the

---

*Bayer Healthcare LLC*, No. 17-1316-RGA, 2019 WL 3290987 (D. Del. July 22, 2019), should be rejected. *Cf. supra* at 35.

statements were only made in response to § 112 rejections and limited to draft claims 20 and 21 is false." *Supra* at 63. Defendants are incorrect for three reasons.

*First*, draft claims 20 and 21 were added on March 18, 2015, and claim 20 included the limitation "disables the keyboard … in the frame mode." Ex. 57, LITL00246161. This occurred two months *before* the May 18, 2015 prior-art rejections that Defendants point to. *Supra* at 62. That limitation in claim 20 was thus *not* "added in response to a prior art rejection," as Defendants contend. *Supra* at 62.

*Second*, the May 18, 2015 prior-art rejections were limited to draft claims 1-4, 6-19, and 22-26. Draft claims 20 and 21 were *not* rejected based on prior art; they were rejected *solely* under § 112. *See* Ex. 57, LITL00246242-245.

*Third*, all statements that Defendants point to (*supra* at 62-63 (quoting Ex. 57, LITL00246242-243)) appear in a section whose title and opening sentence expressly state that it is *based on Section 112*. Ex. 57, LITL00246242. Defendants latch onto a statement at the end of the Section 112 arguments that "none of the references disclose [the limitation-at-issue,] as recited in claims 20 and 21." *Id.*, LITL00246243. However, this statement was *not* made in response to a prior-art rejection because, as noted above, draft claims 20 and 21 were *not* rejected based on prior art.

Thus, LiTL's assertion that its statement was not "made to overcome a prior art rejection" (*supra* at 59) was correct.

    b.  Defendants Fail to Show that LiTL's Interpretation of the Prosecution History Is Unreasonable.

Defendants dispute three aspects of the prosecution history: (1) the meaning of LiTL's addition of "easel mode" to the claims; (2) whether LiTL's statement had a "clear" and

"unequivocal" meaning; and (3) the significance of the examiner and Defendants' own IPR expert applying the very construction LiTL now proposes.

**First**, Defendants dispute LiTL's assertion that LiTL's "statement about 'other modes' … referred only to other modes that were encompassed *at that time* by the claim language." *Supra* at 67 (quoting Ex. 57, LITL00246242). Defendants observe that "*easel mode was already recited in draft claim 12*" at the time of LiTL's statement. *Supra* at 63 (emphasis in original). But LiTL's statement about "other modes" was expressly directed to draft claims 20 and 21, not draft claim 12.

Defendants also dispute what "LiTL intended" when, ten months **after** making the "other modes" statement, it amended draft claim 20 to add "easel mode." *Supra* at 63 (citing Ex. 57, LITL00246393). This *ex-post* event is irrelevant to whether LiTL's **earlier** statement about "other modes" referred to easel mode.

While the parties may disagree about the meaning of LiTL's reference to "other modes," Defendants have not shown that LiTL's interpretation is unreasonable.

**Second**, Defendants attempt to brush away *Vectura*, *Continental Circuits*, and *Vetstem* (while overlooking *SunRace*), all of which found no disclaimer (*supra* at 58-59), with two conclusory assertions: that the reason for LiTL's July 20, 2015 amendments was "clear" (*supra* at 63-64) and that LiTL's statements about frame mode were made "unequivocally" (*supra* at n.10). Defendants' bald assertions that the prosecution history is "clear" and "unequivocal" do not make it so, let alone demonstrate that LiTL's interpretations are unreasonable.

**Third**, Defendants downplay the fact that their IPR expert and the examiner both understood that prior art that disabled the keyboard in multiple modes could read on the '229 claims. Defendants do not dispute that that their IPR arguments "reflect the position that LiTL

had not disclaimed all display modes other than frame mode in which the keyboard was disabled." *Supra* at 60. They contend (with no supporting citation) that "Defendants' arguments have no bearing on LiTL's disclaimer" (*supra* at 65). But the fact that ***Defendants' own '229 IPR expert applied the same construction LiTL now proposes***, and did so after analyzing the '229 file history, is evidence that LiTL's interpretation is not unreasonable. Ex. 56, ¶¶ 77-94.

Defendants assert that "the examiner found that Kamikakai disclosed the keyboard disabled only in frame mode," but nothing in the cited page (Ex. 57, LITL00246354) supports their assertion. Moreover, Defendants do not dispute that the sentence LiTL identified in Kamikakai (Ex. 43, DPA_000015 (7:4-8)) shows that, under the examiner's theory, the disabled keyboard in Kamikakai would "apply as well to 'tablet mode' as to 'frame mode'" (*supra* at 60).

Defendants cite *Spring Windows* for the proposition that "an applicant's statement distinguishing prior art" may be relevant to claim construction. *Supra* at 65. But LiTL never argued that the "disable the keyboard" limitation distinguished Kamikakai. Instead, LiTL amended the '229 claims to add the "accelerometer" limitation (Ex. 57, LITL00246386-401) and the "display manager" limitation (*id.*, LITL00246471-486).

In sum, the examiner and Defendants' own IPR expert took positions that track LiTL's proposed construction, confirming that LiTL's position is reasonable. Defendants thus fail to establish the "clear and unmistakable" disclaimer that their proposed construction requires.

### 4. Defendants' Sur-Reply Position

LiTL does not dispute that the *only* mode for which the '229 patent discloses disabling the keyboard is the frame mode, or that the '229 patent teaches that the keyboard may be used (*not* disabled) in easel mode. '229 Patent at 16:57-61; *Supra* at 67.  Accordingly, if the claims were not limited to disabling the keyboard *only* when in the frame mode, they would not satisfy the written description requirement of §112.  In this context, LiTL's disclaimers, which apply to

all the '229 patent claims, were clear and unambiguous.  Furthermore, LiTL does not dispute that disclaimers can be found in arguments made in response to section 112 rejections.  *Supra* at 65, n.11.

LiTL's interpretation that draft claims 20 and 21 limited the disclaimers to only the laptop and closed modes is unreasonable.  Claim 21 depended from claim 1, which recited a "plurality of display modes," and claim 12, which also depended from claim 1, recited "the plurality of display modes includes a[n] easel mode."  Ex. 57, LITL00246234-39.  Claims 1 and 21 therefore necessarily encompassed easel mode.  LiTL's argument that its prosecution statements about "other modes" of claim 21 referred to only the laptop and closed modes is therefore unreasonable.

Defendants did not rely on "bald assertions" to distinguish LiTL's case law, as LiTL suggests,[13] but on LiTL's statement that the keyboard was disabled only in frame mode because the problem being solved only existed in frame mode.  *Supra* at 65, n.10.  Lastly, LiTL's reference to what Defendants' IPR expert or the patent examiner may have said (which is disputed) are irrelevant because they cannot change LiTL's disclaimer.

### G.    Term 7: '888 and '315 Preambles

|  | LiTL's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Disputed Term:** Preambles<br><br>**Relevant Claims:** 8,612,888 Claims 1, 26, 27 9,003,315 Claims 1, 27, 28 | The preambles are not limiting. | The preambles are limiting. |

---

[13] LiTL suggests Defendants overlooked *SunRace*, but that case is distinguished on the same basis.

| Why resolution of the dispute matters | The dispute concerns whether the preambles are limiting. LiTL expects that resolving this dispute could affect whether Defendants assert certain noninfringement and invalidity defenses. | The parties are in agreement on the construction of "I/O profile," which appears in both the body of the identified '888 claims and the preambles of the identified '888/'315 claims. Resolution of whether the preambles are limiting may impact Defendants' non-infringement defenses for these claims. |

### 1.    Plaintiff's Opening Position

The parties dispute whether the '888 and '315 preambles are limiting.

With regard to the '888 independent claims, their preambles recite a method or system "for accessing and managing digital media libraries on a streamlined computing device with a plurality of selectable I/O profiles." This phrase is not limiting for two reasons.

**First**, this phrase merely identifies an intended use. The claim bodies do not claim "digital media libraries" – that term appears only in the preambles. Moreover, the intended use does not "impose[] any structural requirement on the claimed [computing device] beyond what is required by the bodies of the claims." *Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1328 (Fed. Cir. 2019) (preamble not limiting). Accordingly, this preamble "merely provides context for the limitations" in the claim bodies and is not limiting. *Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1292 (Fed. Cir. 2015).

**Second**, the stated intended use "identifies no structure for the apparatus claimed." *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1355 (Fed. Cir. 2020) (preamble not limiting). "The bodies of the claims contain the only descriptions of the structure for the [computing device], with no additional structure furnished by the preamble phrase at issue." *Id.* For example, the claim bodies describe "a display component," "a base," "a graphical

user interface," "a view selector component," and "an I/O profile" – the phrase "for accessing and managing digital media libraries" provides no additional structure. Thus, "the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention." *Catalina Mktg. Int'l, Inc.*, 289 F.3d at 809.

The '315 Preambles are likewise not limiting. Specifically, Defendants appear to contend the phrase "I/O profile(s)" (appearing in the preambles) is limiting. This phrase, however, does not appear in the bodies of the '315 claims, and LiTL "did not rely on this phrase to define its invention." *Catalina*, 289 F.3d at 810. It is thus not limiting.

## 2.      Defendants' Answering Position

The dispute here is whether "I/O profile" recited in the preambles of the '888 and '315 Patent claims is limiting, as reflected in the JCCC filed by the parties.  Ex. 1, p. 20.

For the '888 Patent, LiTL's arguments are directed to a different term in the preambles, "digital media libraries." *Supra* at 71-72.  LiTL argues that this other term is not recited in the body of the claims, and so is not limiting. *Supra* at 71-72.  However, whether one term in the preamble—"I/O profile"—is limiting does not require that another term in the preamble—"digital media libraries"—is also limiting. *See Cochlear Bone Anchored Sols. AB*, 958 F.3d at 1355.  That is, whether a specific term in a preamble is limiting is determined for that specific term, not the preamble as a whole. *See id.*  The dispute here is whether "I/O profile" in the preamble is limiting, so LiTL's arguments directed to a different part of the preamble are irrelevant.

As to I/O profile, that term is indeed recited in the body of the '888 Patent claims.  After reciting "a plurality of selectable I/O profiles" in the preamble (Ex. 9 ('888 Patent), 47:55-56), claim 1 goes on to recite a step performed "in response to selection of an I/O profile" (*id.*, 47:60-61).  The "plurality of selectable I/O profiles" establishes the plurality from which the "I/O

71

profile" is selected in the body of claim 1.  The same is true for independent claims 26 and 27. *Id.*, 50:63 (claim 26), 51:1-2 (claim 26), 51:38 (claim 27), 52:5-8 (claim 27).  *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F.3d at 808 (preamble term providing antecedent basis "may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention").

"I/O profile" in the preamble of the '888 and '315 Patents is limiting for several additional reasons.  First, both patents describe the *invention* of the patents as being a computer that uses a "plurality of selectable I/O profiles."  '888 Patent, 3:8-11 ("According to one aspect of the present invention, a method for accessing and managing digital media libraries on a streamlined computing device with a plurality [of] selectable I/O profiles is provided."); Ex. 6 ('315 Patent), 2:51-55 (similar).  Characterization of the invention as using the preamble term is another indication that the term should be limiting.  *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1025 (Fed. Cir. 2015).

Second, while LiTL characterizes the preambles as merely reciting a statement of intended purpose, *supra* at 71-72, "statements of intended purpose in methods of using apparatuses or compositions has tended to result in a conclusion that such preamble language is limiting."  *Eli Lilly Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1341 (Fed. Cir. 2021). Claim 1 of the '888 Patent and claim 27 of the '315 Patent are methods of using apparatuses, and thus the preambles should be treated as limiting under LiTL's characterization.  *Id.*

Third, where the preamble describes a claimed apparatus for which the body provides method steps performed by the apparatus—"nothing but functional properties of the claimed apparatus"—the claim body does not recite a structurally complete invention, which renders the preamble limiting.  *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d

1367, 1375 (Fed. Cir. 2021). At least claim 26 of the '888 Patent is an apparatus for which the body of the claim provides method steps performed by that apparatus. '888 Patent, 50:58-64 ("A non-transitory computer-readable medium having computer-readable instructions stored thereon that as a result of being executed by a computer, instruct the computer to perform the method… wherein the method comprises:").

"A plurality of selectable I/O profiles" should be construed as limiting.

### 3.    Plaintiff's Reply Position

#### a.    '315 Preambles

Defendants do not dispute that the phrase "I/O profile(s)" "does not appear in the bodies of the '315 claims" and was not relied upon during prosecution. *Supra* at 71. The '315 preambles are thus non-limiting.

Defendants argue the '315 preambles should be limiting for two reasons. ***First***, Defendants incorrectly contend that both the '315 and '888 specifications "describe the *invention* of the patents as being a computer that uses a 'plurality of selectable I/O profiles.'" *Supra* at 72. In fact, each "patent includes a long list of different '[aspects or embodiments] of the present invention'" and thus "it seems unlikely that the inventor intended for each claim to be limited to all of the many objects of the invention." *Pacing Techs.*, 778 F.3d at 1025. Only a handful of the "aspects of the present invention" recitations mention "I/O profile"; thus, LiTL did not characterize the invention as a whole as using that term. '888 Patent, 3:8-11:64; '315 Patent, 2:51-11:19.

***Second***, Defendants incorrectly contend that LiTL characterized the preamble of '315 claim 27 as "merely reciting a statement of intended purpose." *Supra* at 72. To the contrary, LiTL explained that "[w]ith regard to the ***'888*** independent claims," the preamble "identifies an intended use." LiTL did ***not*** make that argument for the '315 Patent.

Accordingly, the '315 preambles are not limiting.

> b.    '888 Preambles

Defendants clarify that, as to the '888 Patent, they contend only the term "I/O profile" – not the entire preambles – are limiting. *Supra* at 71. Defendants do not dispute LiTL's argument that "digital media libraries" is not limiting. *Supra* at 71-72. Defendants also do not dispute that the '888 claim 27 preamble "merely identifies an intended use" (*supra* at 70), and thus is not limiting. The remaining '888 preambles are not limiting because, as noted above, Defendants' reliance on *Pacing Technologies* is inapposite.

> **4.    Defendants' Sur-Reply Position**

The '888 claim bodies recite "providing for transition between the plurality of views in response to *selection of an I/O profile.*" '888 Patent, claim 1, 26 (same), 27 (similar). The preamble's "I/O profile" language provides context to understand these limitations: the device/system must include I/O profiles, because the transition is responsive to selecting one such profile. *Deere & Co. v. Bush Hog*, *LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012) (preamble "rotary cutter" language limiting because it "informs the meaning of the 'torsional stiffness' limitation—the claimed structure must possess sufficient stiffness to withstand the torsional loads imposed by the operation of a rotary cutter"). For claim 27 only, LiTL asserts this is an intended use. But the Federal Circuit recognized that when claims describe an entity functionally, like claim 27, the body does not recite a structurally-complete invention. *Supra* at 74.

For the '315 patent, the specification identifies I/O profiles as part of the "invention" *five separate times*. '315 Patent, 2:51-55, 6:43-46, 8:63-9:2, 9:3-5, 25:25-28. It also describes I/O profiles as providing key benefits to the system/device. *Id.*, 15:24-28, 17:45-67, 25:21-25; *Prolitec Inc. v. ScentAir Techs.*, *LLC*, No. 20-984-WCB, 2023 WL 8697973, at *5 (D. Del. Dec.

74

13, 2023) (preamble language limiting where "specifications teach that [it] is a key feature of the invention").

### H.    Term 8: "Streamlined Computing Device"

|  | LiTL's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Disputed Term:** streamlined computing device<br><br>**Relevant Claims:** 8,612,888 Claims 1, 26, 27 | Not indefinite.<br><br>The plain and ordinary meaning of "streamlined computing device" is "computing device configurable into a plurality of physical configurations some of which have a simplified I/O profile (in comparison to a typical desktop or laptop computer)" | Indefinite |
| **Why resolution of the dispute matters** | The dispute concerns whether the term is indefinite. LiTL favors deferring resolution of the indefiniteness issue until summary judgment to allow development of the record, particularly during expert discovery. Should the Court eventually need to resolve the dispute, a resolution could affect whether the claims are invalid. | Resolution of this construction will impact invalidity and non-infringement. If Defendants' position is adopted, it would be dispositive as to invalidity for all asserted claims of the '888 patent. If the term can be construed, it would impact the non-infringement positions that Defendants would present. |

### 1.    Plaintiff's Opening Position

The parties dispute whether the term "streamlined computing device" is indefinite. Because proving indefiniteness is Defendants' burden, LiTL will respond to Defendants' arguments in its reply brief.

### 2.    Defendants' Answering Position

Independent claims 1, 26, and 27 of the '888 Patent recite methods, computer program products, and systems that relate to a "streamlined computing device." "Streamlined" is an

everyday term that generally means simpler or more efficient.  Ex. 49, ¶24, Appx. B, C.

"Streamlined" is a term of degree—determining whether a device is simpler or more efficient

requires comparing that device to some baseline—and the patent must therefore provide "some

standard for measuring that degree."  *Biosig Instruments*, *Inc. v. Nautilus*, *Inc*., 783 F.3d 1374,

1378 (Fed. Cir. 2015) (citation omitted).

The '888 Patent does not provide any such standard.  The claims do not give context

around what "streamlined" means; they refer only to other aspects of the device, such as its GUI,

rotatable base, and plurality of I/O profiles.  *E.g*., '888 Patent, 47:55-59, 48:1-4 (claim 1).  The

claims also fail to identify what the device is "streamlined" in comparison to, and they give no

criteria by which a POSITA could determine whether one device is simpler or more efficient

than another.  POSITAs could reasonably disagree as to what makes a device simpler or more

efficient.  Ex. 49, ¶25; *Interval Licensing LLC v. AOL*, *Inc*., 766 F.3d 1364, 1371 (Fed. Cir.

2014) ("[A] term of degree fails to provide sufficient notice of its scope if it depends 'on the

unpredictable vagaries of any one person's opinion.'") (citation omitted).  Thus, even though the

word "streamlined" has a plain meaning, a POSITA would not be able to determine the

boundaries of the claims.  *E.g*., *Sprint Commc'ns Co. v. Comcast IP Holdings*, *I*, *LLC*, No. 12-

1013-RGA, 2014 WL 309432, at *7 (D. Del. Jan. 28, 2014) (determining that although "the

word LATA [local access transport area] is well defined [that] does not mean that a PHOSITA

can discern the boundaries of any claim incorporating it.  LATAs can vary widely in size, with

some being as small as Rhode Island and others encompassing virtually all of Maine."), (footnote

omitted), *aff'd sub nom. Sprint Commc'ns Co. v. Comcast Cable Commc'ns*, *LLC*, 675 F. App'x

974 (Fed. Cir. 2017).

"Where, as here, we are faced with a purely subjective claim phrase, we must look to the written description for guidance." *Interval Licensing*, 766 F.3d at 1371 (citation omitted). The specification, however, uses the "streamlined" terminology inconsistently. Ex. 49, ¶¶26-29. Some embodiments call a device "streamlined" because it includes less storage or outsources storage-heavy processing tasks. '888 Patent, 20:37-43, 17:8-22. Other embodiments indicate that devices with restricted user input/output options are "streamlined." *Id*., 38:44-47, 35:60-64, 38:62-65. Others define a "streamlined user interface" as a "map interface." *Id*., 19:3-11. Still others describe devices as "streamlined" because they present content in a visually consistent or user-friendly manner, regardless of I/O profile. *Id*., 38:21-27, 18:10-13, 30:36-43, 39:59-61, 2:47-52.

A POSITA would not be able to determine which of these contradictory embodiments, if any, describes "streamlined" devices of the type claimed. Ex. 49, ¶29. The specification thus fails to provide objective guidance on the boundaries on this term. *E.g*., *Interval Licensing*, 766 F.3d at 1372 (claim term was indefinite where "the specification is at best muddled, leaving one unsure of whether the [claimed] phrase has temporal dimensions as well as spatial dimensions. The hazy relationship between the claims and the written description fails to provide the clarity that the subjective claim language needs."); *Berkheimer v. HP Inc*., 881 F.3d 1360, 1363-64 (Fed. Cir. 2018) ("minimal redundancy" term rendered claim indefinite, where "[t]he specification uses inconsistent terminology to describe the level of redundancy that the system achieves" and "[t]he specification contains no point of comparison for skilled artisans to determine an objective boundary of "minimal").

LiTL's "plain meaning" for this term is a "computing device configurable into a plurality of physical configurations some of which have a simplified I/O profile (in comparison to a

typical desktop or laptop computer)."  However, having multiple different potential configurations does not make a device simpler or more efficient; if anything, this makes a device *less* simple.  Ex. 49, ¶30.  The '888 patent expressly recognizes the complexity added by offering such "myriad configurations."  '888 Patent, 2:3-6.  Further, LiTL's construction is inconsistent with the majority of the specification's examples of "streamlined" devices, discussed above. LiTL cherry-picks a single reference to "typical desktop and laptop systems" (*id*., 38:44-45), but identifies no basis for treating this sentence as singularly definitive.  And LiTL's construction injects even more ambiguity with the following:  it requires comparing the streamlined device to a "typical desktop or laptop," though there is no such "typical" computer; and it requires a "simplified" profile, but fails to specify what qualifies as "simplified."  Ex. 49, ¶31.  LiTL's construction is unsupported and does not remedy the indefiniteness issues.

### 3.    Plaintiff's Reply Position

Defendants contend the term "streamlined computing device" is indefinite because it is a term of degree without a standard for measuring the degree. *Supra* at 75-76. Not so: the '888 Patent expressly provides the relevant standard: "a streamlined hardware device provides for (in comparison to typical desktop and laptop systems) a reduced user input platform." '888 Patent, 38:44-47; Ex. 62, ¶¶ 46-47. The specification goes on to provide examples of a reduced user input platform – e.g., a scrollwheel and button, which are simpler to use but correspondingly have reduced functionality "in comparison to typical desktop and laptop systems" (which have more complex but versatile user inputs such as a keyboard and mouse).

Defendants' expert, Dr. Terveen, contradicts his prior testimony by opining that "there was no defined set of I/O devices associated with a 'typical' laptop or desktop in the 2008-09 timeframe." Ex. 49, ¶ 31. Dr. Terveen previously testified that "U.S. Pat. No. 9,358,454 states that in the 'typical desktop or laptop computer, a popular *form of user input* is through a

*keyboard* and *mouse*.'" Ex. 58, ¶ 71 (Dr. Terveen's emphasis). Thus, a "typical desktop or laptop computer" is not "purely subjective," as he now contends. Ex. 49, ¶31; Ex. 62, ¶¶ 48-52. These typical I/O devices provide the "objective baseline" from which the claimed "streamlined computing device" differs. *See Biosig Inst.*, 783 F.3d at 1382 (not indefinite because "the width of a user's hands" provided baseline for comparison).

A POSITA would also have understood that a device can be streamlined by using 2-in-1 functionality to avoid the need to switch between two conventional devices (e.g. a laptop and a tablet). Ex. 62, ¶¶ 41-44. Dr. Terveen asserts that "adding functionality is by definition not 'simpler.'" Ex. 49, ¶ 30. But he overlooks the fact that adding functionality to a single device in order to have it do the work of two devices does streamline the user experience.

Defendants concede that "'[s]treamlined' is an everyday term that generally means simpler or more efficient." *Supra* at 75-76. Defendants' own dictionary definitions (Ex. 49, ¶ 24) are consistent with the '888 Patent's explanation that it refers to "simplified accessibility based on the device's I/O platform" (38:65-67). The term thus "has a definite meaning." *ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*, 35 F.4th 1345, 1351 (Fed. Cir. 2022) (citing dictionary definitions). "These definitions confirm that the [disputed term] would have had broad but understood meanings to a skilled artisan." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1350 (Fed. Cir. 2022). In short, a POSITA would have understood the phrase "streamlined computing device" to mean a "computing device configurable into a plurality of physical configurations some of which have a simplified I/O profile (in comparison to a typical desktop or laptop computer)." Ex. 62, ¶ 40.

Indeed, Defendants and their IPR expert expressed no difficulty using the term when they asserted that "a POSITA would have understood Reavey's computing device is 'streamlined' in

the same way as taught in the '888 Patent." Ex. 61, ¶ 77; Ex. 35, p. 27; Ex. 62, ¶¶ 57-60.

Defendants' failure to allege indefiniteness of the term "streamlined computing device" in their

IPRs is notable because they alleged indefiniteness for six *other* terms. Ex. 35, 14 n.3 and 44 n.4.

Dr. Terveen overlooks (Ex. 49, ¶ 26) this "evidence that a skilled artisan did understand" the

term. *Sonix Tech. v. Publications Int'l*, 844 F.3d 1370, 1379-80 (Fed. Cir. 2017).

### 4.    Defendants' Sur-Reply Position

LiTL's reply confirms that the scope of "streamlined" depends on "unpredictable

vagaries of [a POSITA's] opinion." *Interval Licensing*, 766 F.3d at 1371 (citation omitted).

LiTL does not dispute that "streamlined" is a term of degree. Instead of identifying an

objective standard for this term, however, LiTL suggests different ways "streamlined" might be

assessed. LiTL cites disclosure of a device with "a reduced user input platform" (38:44-47) or,

alternatively, "simplified accessibility based on the device's I/O platform" (38:65-67). Its expert

speculates that a device which "avoids the need to switch between two devices" may be

streamlined. Ex. 62, ¶42. LiTL's "standards" are inconsistent with each other, its actual

proposed construction, and the specification's myriad other references to "streamlined" devices.

*Supra* at 78-79 (listing citations). This is unlike *Niazi*, where the "written description contain[ed]

numerous examples" supporting a plain meaning. 30 F.4th at 1350 (recognizing claims would

have been indefinite had terms been "subjective … resulting in a variable claim scope depending

on the particular eye of any one observer").

POSITAs—like Drs. Terveen and Bear—will have different subjective understandings of

what makes a device "streamlined." This is akin to language like "aesthetically pleasing," which

the Federal Circuit has found indefinite: the "scope of the claim changed depending on a

person's subjective determination as to whether the interface screen was 'aesthetically

pleasing.'" *Id.* at 1348 (citation omitted). Further, the specification's examples do not indicate

the **outer bounds** of the claims, as §112 requires. *Interval Licensing*, 766 F.3d at 1373-74 (claims' use of "unobtrusive manner" rendered them indefinite, despite specification's example, because POSITAs were left "to wonder what *other* forms of display are unobtrusive and non-distracting").

LiTL asserts (at 81) that Defendants failed to argue indefiniteness in IPR petitions. But "the Board may not cancel claims for indefiniteness in an IPR proceeding." *Samsung Elecs. Am.*, *Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1350 (Fed. Cir. 2020). LiTL does not identify any definition Defendants advanced that should apply—unlike *Sonix*, where experts "repeatedly applied the term to the references and the accused products" throughout litigation. 844 F.3d at 1380.

## I.    Term 9: "Map Based Graphical User Interface"

| | LiTL's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Disputed Term:** map based graphical user interface <br><br> **Relevant Claims:** 9,003,315 Claims 1, 27 | Not indefinite. <br><br> The plain and ordinary meaning of "map based graphical user interface" is "a graphical user interface that displays representations of higher-level constructs into which content is grouped" | Indefinite |
| **Why resolution of the dispute matters** | The dispute concerns whether the term is indefinite. LiTL favors deferring resolution of the indefiniteness issue until summary judgment to allow development of the record, particularly during expert discovery. Should the Court eventually need to resolve the dispute, a resolution could affect whether the claims are invalid. | Resolution of this construction will impact invalidity and non-infringement. If Defendants' position is adopted, it would be dispositive as to invalidity for all asserted claims (except claim 28) of the '315 patent. If the term can be construed, it would impact the non-infringement positions that Defendants would present. |

### 1.    Plaintiff's Opening Position

The parties dispute whether the term "map based graphical user interface" is indefinite. Because proving indefiniteness is Defendants' burden, LiTL will respond to Defendants' arguments in its reply brief.

### 2.    Defendants' Answering Position

Independent claims 1 and 27 of the '315 Patent recite presentation of a "map based graphical user interface."[14]  The '315 Patent does not provide a reasonably certain indication of what a "map-based" GUI is, and a POSITA would not understand or be able to ascertain the full scope of the claims.  This term is indefinite.

The '315 Patent provides at least five characterizations of what a "map-based" GUI might include.  First, the '315 Patent describes displaying a "mapping" between content and visual representations using a "nascent card," a "quick access view," or a "web card."  '315 Patent, 5:16-47, 8:1-25, 8:26-54, 10:18-49, 10:50-11:19, 15:34-58.  A POSITA would have understood these passages to vaguely describe rendering visual content that is "mapped" to some underlying data, using some or all of these GUI features.  Ex. 49, ¶¶40-41.  Second, displaying a map-based GUI is described as "displaying a plurality of views of a plurality of visual representations of computer content."  '315 Patent, 6:43-7:10.  Third, a map-based GUI "provides a clear overview of the entire computing environment and searching capability within the environment that may be accessed using the scroll wheel 132 and, optionally, one o[f] navigation buttons 166, 168…."  *Id.*, 20:31-64.  Fourth, the map-based GUI is a screen that is vertically divided into "bars" that correspond to different modes of content."  *Id.*, 21:45-60,

---

[14] Referred to as "map-based GUI" hereafter.

Fig. 12.  Fifth, the map-based GUI is described as a hierarchically-arranged interface.  *Id.*, 22:44-64.

These characterizations do not provide reasonable certainty as to the meaning of a "map-based" GUI, because they provide an unbounded list of features that may—or may not—be used with a "map-based" GUI.  The first usage describes a relationship between displayed content and underlying data.  But it does not inform a POSITA what actual features are required in a "map-based" GUI, other than the optional GUI features like a "nascent card," a "quick access view," or a "web card."  Ex. 49, ¶¶40-41.  The second usage indicates that a "map-based" GUI can include a "plurality of views."  But that feature is also used in claim 28, which is not a "map-based" GUI ('315 Patent, 73:21-34), indicating that this feature is not definitional of a "map-based" GUI. Usages three, four, and five provide additional optional features that can be used with a "map-based" GUI, such as:  a series of vertical "bars" across the screen, a "'desktop' and icon configuration," a "'dashboard' type display," and a hierarchical organization.  *Id.*, 20:31-46, 21:45-60, 22:44-64.  But each of these features is applicable only to some embodiments, providing a POSITA no reasonable certainty as to what is required for a GUI to be considered "map-based."  Ex. 49, ¶¶40-46.  Furthermore, the only "map-based" GUI known to a PHOSITA outside the scope of the '315 Patent was a GUI that displayed geographical data.  *Id.*, ¶¶34-35. So general knowledge in the art does not provide any guidance on "map-based" GUI here. With no bounds provided for the meaning of "map-based," that term is indefinite.

LiTL proposes that a map-based GUI is "a graphical user interface that displays representations of higher-level constructs into which content is grouped."  Ex. 1, p. 20.  But the '315 Patent never uses the term "construct," it does not describe what is a "higher-level

construct," and it does not describe what the relative term "higher-level" is measured against. Ex. 49, ¶48.

To the extent that LiTL argues that its construction reflects the GUI described for Figures 11 and 12, LiTL has impermissibly narrowed the claims to a disclosed embodiment. Figure 11 is not a GUI at all, but rather a "architecture of the portable computer" that includes "a map user interface." '315 Patent, 20:47-49. In any case, it is only "one example" of such an architecture (*id.*) and thus not definitional for "map-based" GUI. Ex. 49, ¶¶49-50. Figure 12 likewise describe "one embodiment" for which for which navigation through a "map-based" GUI *may* refer. '315 Patent, 21:45-50, 21:50-56.

LiTL's construction is also inconsistent with its infringement contentions. Claims 1 and 27 both recite that the map-based GUI includes "a plurality of views of a plurality of visual representations of computer content." '315 Patent, 69:45-54, 72:35-40. LiTL points to the Windows 10 tablet-mode GUI (left below) and the Windows 10 desktop-mode GUI (right below) as the two "views." LiTL points to both of these GUIs as a "map based graphical user interface," as indicated by the magenta highlights below. But to the extent that there are any groupings of content into "higher-level constructs" in the tablet-mode GUI (left below), those groupings are missing from the desktop-mode GUI (right below).



Ex. 47, p. 3.  The vague nature of both "map based" and LiTL's own "higher-level constructs" renders this claim term impossible to construe, impossible to apply with any clarity for the purposes of infringement, and impossible for a POSITA to be on notice of the scope of the claims.  This term should be found indefinite.

### 3. Plaintiff's Reply Position

Defendants contend the term "map based graphical user interface" is indefinite because the specification uses the term in different ways. In IPR proceedings, however, Defendants' IPR expert, Dr. Houh, "did not express any uncertainty as to the scope of ['map based GUI,'] or encounter any apparent difficulty in applying the term to the references." *Sonix*, 844 F.3d at 1380. He explained the term "map based GUI" by referencing Figure 11 and its corresponding description (20:33-60), which he annotated to illustrate "groupings of content" and "modes of content 172." Ex. 33, ¶¶ 93-94.



*Id.*, ¶ 93 ('315 Figure 11).

Defendants' other IPR expert, Dr. Wolfe, explained that "modes of content" refers to "information that represents a higher-level construct into which content is grouped." Ex. 59, ¶ 80 (quoting PTAB's construction)).

Though identified in LiTL's citations (Ex. 1, p. 20), Defendants and their latest expert, Dr. Terveen, overlook their own earlier expert Dr. Houh's IPR testimony where he applied the term "map based GUI" without difficulty.

Defendants contend the term "map based GUI" encompasses "an unbounded list of features" but they specifically identify just five usages of the term. *Supra* at 83. These usages illustrate the scope of the term "map based GUI." Ex. 62, ¶¶ 64-70, 77-89. Even assuming five usages suffice for the scope of a term to be considered "broad," "[a] term's broad scope does not make it indefinite." *Alarm.com, Inc. v. SecureNet Techs. LLC*, 345 F. Supp. 3d 544, 550 (D. Del. 2018) (Andrews, J.).

Lastly, Defendants' contention that this limitation is "missing" from the accused products (*supra* at 84) indicates that they were able to apply it. In any event, to the extent that there are "line-drawing problems" here, such problems are "properly left to the trier of fact": they do not show indefiniteness. *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007).

In sum, "map based GUI" means "a graphical user interface that displays representations of higher-level constructs into which content is grouped." Ex. 62, ¶¶ 71.

### 4.    Defendants' Sur-Reply Position

LiTL argues that Defendants did not argue indefiniteness in IPRs, but again, the Board cannot consider indefiniteness. And the IPR petitions did not propose a definition for "map based GUI." Instead, the only expert that addressed the '315 Patent analogized prior art to a patent figure. Ex. 33, ¶¶93-95.

LiTL also asserts that the '315 Patent describes a "broad" scope for this term. Unlike *Alarm.com*, however, the specification's disclosures do not fit within any plain meaning of "map based GUI." 345 F. Supp. 3d at 549-50 (determining that specification's references were all "consistent with a broad definition of the term 'objects' to include data or information"). The patent identifies characteristics that *might* be part of a "map based GUI," but provides no guidance about what this term means more generally. And significantly, LiTL does not identify intrinsic support for its plain meaning of "map based GUI." LiTL instead cites its expert's discussion (Ex. 62, ¶71) regarding a different term—"modes of content"—that does not relate to the "map based" language.

Date: September 17, 2024

OF COUNSEL:

Michael A. Albert
Eric J. Rutt
Gerald B. Hrycyszyn
Suresh Rav
Jason W. Balich
Jie Xiang
Kevin Y. Li
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
(617) 646-8000
malbert@wolfgreenfield.com
erutt@WolfGreenfield.com
ghrycyszyn@wolfgreenfield.com
srav@wolfgreenfield.com
jbalich@wolfgreenfield.com
jxiang@wolfgreenfield.com
kli@wolfgreenfield.com

OF COUNSEL:

PERKINS COIE LLP
Christina J. McCullough
Stevan R. Stark
Jassiem Moore
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
(206) 359-8000

Kyle R. Canavera
11452 El Camino Real, Suite 300
San Diego, CA 92130-2080
(858) 720-5700

Chad Campbell
Elizabeth Baxter
2525 E. Camelback Road, Suite 500
Phoenix, AZ 85016-4227
(602) 648-7000

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Adam W. Poff*
Adam W. Poff (#3990)
Robert M. Vrana (#5666)
Alexis Stombaugh (#6702)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
rvrana@ycst.com
astombaugh@ycst.com

*Attorneys for LiTL LLC*

RICHARDS LAYTON & FINGER, P.A.

*/s/ Kelly E. Farnan*
Kelly E. Farnan
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7705

*Attorneys for Intervenor-Plaintiff
Microsoft Corporation*

88

*Attorneys for Intervenor-Plaintiff*
*Microsoft Corporation*

DLA Piper LLP (US)
Sean Cunningham
Erin Gibson
4365 Executive Drive, Suite 1100
San Diego, CA 92121-2133
858-677-1400

James M. Heintz
One Fountain Square
11911 Freedom Drive, Suite 300
Reston, VA 20190-5602
703-773-4000

Jackob Ben-Ezra
845 Texas Avenue, Suite 3800
Houston, TX 77002
713-425-8431

Claire E. Schuster
33 Arch Street, 26th Floor
Boston, MA 02110-1447
617-406-6000

Aima Mori
444 West Lake Street, Suite 900
Chicago, IL 60606-0089
312-368-4000

*Attorneys for Defendant HP Inc.*

FARELLA BRAUN + MARTEL LLP
Eugene Y. Mar
Erik Olson
Tom Pardini
Raven Quesenberry
One Bush Street, Suite 900
San Francisco, CA 94104
(415) 954-4400

*Attorneys for Defendants*
*Dell Inc. and Dell Technologies Inc.*

DLA PIPER LLP (US)

*/s/ Brian A. Biggs*
Brian A. Biggs (#5591)
Angela C. Whitesell (#5547)
1201 North Market Street, Suite 2100
Wilmington, DE 19801-1147
302-468-5700
brian.biggs@us.dlapiper.com
angela.whitesell@us.dlapiper.com

*Attorneys for Defendant HP Inc.*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

*Attorneys for Defendants*
*Dell Inc. and Dell Technologies Inc.*

89

PROCOPIO, CORY, HARGREAVES &
SAVITCH LLP
Robert H. Sloss
Jack Shaw
3000 El Camino Real, Suite 5-400
Palo Alto, CA 94306
(650) 645-9000

*Attorneys for Defendants*
*ASUSTeK Computer Inc. and ASUS Global*
*Pte. Ltd.*

POLSINELLI PC

*/s/ Stephen J. Kraftschik*
Stephen J. Kraftschik (#5623)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
(302) 252-0920
skraftschik@polsinelli.com

*Attorneys for Defendants*
*ASUSTeK Computer Inc. and ASUS Global*
*Pte. Ltd.*